GENERAL ELECTRIC CREDIT CORPORATION et al., Petitioners,

v.

Roynold A. SMAIL et ux., Respondents.

No. B–7866.

Supreme Court of Texas.

April 25, 1979.

Key, Carr, Evans & Fouts, Yvonne M. Faulks and Donald M. Hunt, Travis D. Shelton & Associates, Dennis W. McGill, Lubbock, for petitioners.

Walters & Associates, James A. Walters and Steven M. Sucsy, Lubbock, for respondents.

GREENHILL, Chief Justice.

Roynold A. and Laverne Smail instituted this suit in the District Court of Lubbock County to recover for damages resulting from alleged breaches of warranty in the sale of, and installation of, a mobile home. Named as defendants were Sequoya Mobile Homes, Inc. ("Sequoya"), the manufacturer of the mobile home, and Glenn Crawford, d/b/a Crawford Mobile Homes ("Crawford"), the retail dealer of the mobile home. The Smails further alleged that Crawford and General Electric Credit Corporation ("General Electric"), the assignee of the Smails' installation contract, violated the Federal Truth in Lending Act ("Federal Act")[1] and the Texas Consumer Credit Code ("Texas Act").[2]

The trial court, relying in part upon the jury's verdict, rendered a take-nothing judgment. The Court of Civil Appeals in *Smail v. Sequoya Mobile Homes, Inc.,* 568 S.W.2d 385 (Amarillo 1978), affirmed the take-nothing judgment of the trial court on the cause of action based upon the alleged breaches of warranty and the Texas Consumer Credit Code. It severed the cause of action which alleged violations of the Federal Act, and reversed the take-nothing judgment and rendered the statutory judgment of one thousand dollars in favor of the Smails. Since the Federal Truth in Lending Act provides for the award of attorney's

fees, and such were not determined in the trial court, the Court of Civil Appeals also severed the claim for attorney's fees and remanded the case for a determination of that amount. We affirm the Court of Civil Appeals judgment as to the alleged warranty defects and Texas Act violations and reverse its judgment as to the alleged violations of the Federal Act; and in doing so, we affirm the take-nothing judgment of the trial court.

The Smails purchased a Sequoya mobile home from Crawford on September 21, 1974. They executed a document which was entitled a "Retail Installment Contract Vehicle Security Agreement" ("contract" or "agreement") which was immediately assigned by Crawford to General Electric. The contract was printed on the front and back of a single sheet of paper with the buyer's signature at the bottom of the front or face of the agreement. The contract recited that the Smails had made a cash down payment of $950.00 on a purchase price of $9,457.00, leaving as an unpaid balance $8,507.00. When added to the costs of property insurance, taxes, fees, and tags, the total amount financed by General Electric was $9,711.90. The record reflects that the Smails have kept their payments up-to-date.

Since the day the mobile home was first delivered, the Smails have had complaints about its condition. They contended that the doors and windows would not shut properly and that there was a possibility that the frame was not constructed properly. Despite several minor adjustments made by Sequoya and Crawford, the Smails were not satisfied; and they brought this lawsuit to recover on their warranty and to recover for the alleged violations of the Federal and Texas Acts.

The jury found that the mobile home was free from substantial manufacturing defects in design or workmanship or materials at the time it was delivered to Crawford by Sequoya; that the mobile home was fit for

---

1. 15 U.S.C.A. § 1601 et seq.

2. Article 5069–6.01 et seq. All references to Texas statutes are to Vernon's Texas Civil Statutes Annotated.

the ordinary purpose for which such mobile homes are intended to be used; that at the time the Smails purchased the mobile home in question, it was in the same condition as it was in when it was delivered to Crawford by Sequoya; that the fair market value of the mobile home in the condition the mobile home was in at the time the Smails purchased it was $9,457.00 (the actual purchase price of the mobile home was $8,807.00). Furthermore, the jury did not find that any of the damage to the mobile home was caused by improper installation procedures by Crawford. The Court of Civil Appeals affirmed these findings, and the Smails have not appealed that part of the decision to this court.

### A. *Federal Truth in Lending Act*

The Smails have alleged that several violations of the Federal Truth in Lending Act were contained in the retail sales installment contract provided for, and executed by, Mr. Smail in the purchase of their mobile home. Under the Federal Act a plaintiff is limited to one recovery even if multiple violations occur. 15 U.S.C.A. § 1640(g);[3] and *Tinsman v. Moline Beneficial Finance Co.*, 531 F.2d 815 (7th Cir. 1976). So all parties agree that if the act has been violated, whether once or more, the Smails are entitled to the statutory penalty of one thousand ($1,000.00) dollars plus costs and reasonable attorney's fees. 15 U.S.C.A. § 1640(a).

The Court of Civil Appeals found that the contract violates 12 Code of Federal Regulations § 226.801(b)[4] because the place provided for the buyer's signature is not below the full contents of the document; and because the agreement fails to show on both sides the words: "Notice: see other

sides for important information." As stated above, the terms of the contract appear on both sides with the signature line at the bottom of the face or front of the contract.

Although the agreement does not use the exact language suggested in 12 Code of Federal Regulations § 226.801(b), it does contain on the face the following phrase:

"THE TERMS OF THIS CONTRACT ARE ON BOTH SIDES OF THIS PAGE."

Furthermore, on the reverse side the following sentence is found after the additional terms and conditions:

"(See other side for Buyer's signature)."

On Motion for Rehearing in the court below, General Electric argued that the above-quoted passages substantially complied with section 226.801(b). The jury in the trial court had made a finding to that effect. The Court of Civil Appeals noted quite correctly that the availability of substantial compliance as a defense to violations of the Federal Act is somewhat in doubt.[5] The court below went on to hold that as a matter of law General Electric did not substantially comply with the notice provisions of section 226.801(b). Furthermore, it stated that in order not to thwart the purpose of the "regulation" the signature must follow the full content, and not just the required disclosures. We hold that section 226.801(b) is not applicable to the contract in question.

The Federal Truth in Lending Act was enacted ". . . to assure a meaningful disclosure of credit terms so that a consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15

---

**3.** "The multiple failure to disclose to any person any information required under this part . . . shall entitle the person to a single recovery under this section . . . ." 15 U.S. C.A. § 1640(g).

**4.** The Code of Federal Regulations contains the regulations and interpretations which govern the Truth in Lending Act. These are promulgated by the Federal Reserve Board. Although references to the Code of Federal Regulations more commonly use the initials "C.F.R.", for

purposes of clarity this opinion will continue to use the full title.

**5.** Compare *Dixon v. D. H. Holmes Co.*, 566 F.2d 571 (5th Cir. 1978) with *Grant v. Imperial Motors*, 539 F.2d 506 (5th Cir. 1976). However, this court expressly withholds its opinion on the propriety of the defense of substantial compliance to a charge of a violation of the Federal Act.

U.S.C.A. § 1601; and *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 364, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). Congress delegated to the Federal Reserve Board the duty of prescribing the regulations necessary to effectuate the purposes of the Federal Act. 15 U.S.C.A. § 1604.[6] The Board under the power granted to it by Congress in section 1604 promulgated Regulation Z, 12 Code of Federal Regulations §§ 226.1 et seq. Regulation Z is the name commonly used to describe the regulations published by the Federal Reserve Board to effectuate the Truth in Lending Act.

■ These administrative regulations, even though authorized by a statute, are not the same as statutes. Congress alone can enact a statute. *United States v. Mersky,* 361 U.S. 431, 80 S.Ct. 459, 4 L.Ed.2d 423 (1960). However, those regulations promulgated under an enabling statute, or which Congress has declared will be the equivalent of a statute, have the force and effect of law. *Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977). These regulations have been termed "legislative rules."[7] One authority describes these Congressionally-authorized regulations or "legislative rules" as follows:

> A legislative rule is the product of an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the legislative body. In the clearest case of a legislative rule, a statute has conferred power upon the agency to issue the rule and the statute provides that the rule, if within the granted power, shall have the force of law. But a legislative rule may rest upon an implied or an unclear grant of power as well as upon an express and clear grant of power. When a rule is legislative, the reviewing court has no authority to substitute judgment as to the content of the rule, for the legislative body has placed the power in the agency and not in the court. A legislative rule is valid and is as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to the proper procedure, and (c) reasonable. The requirement of reasonableness stems both from the idea of constitutional due process and from the idea of statutory interpretation that legislative bodies are assumed to intend to avoid the delegation of power to act unreasonably.

> K. DAVIS, ADMINISTRATIVE LAW TREATISE § 5.03 (1958 ed. and Supps.).

■ "Regulation Z" is a series of regulations which are in fact "legislative rules," and therefore have the force and effect of federal law. Congress specifically passed the Federal Act with provisions for the Board to pass regulations to prevent circumvention and evasion of the law.[8] The United States Supreme Court in *Mourning v. Family Publications Service, supra,* stated that the force and effect and standard of review of the Board's authority was "well established." It further held:

> Where the empowering provision of a statute states simply that the agency may "make . . . such rules and regulations as may be necessary to carry out the provisions of this Act," we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is "reasonably related to the purposes of

---

6. "The Board shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith." 15 U.S. C.A. § 1604 (1968).

7. Some administrative bodies publish rules or guidelines without Congressional sanction which have been referred to as "regulations" or more properly referred to as "interpretive rules" or "interpretive regulations." These should not be confused with either Congressionally authorized regulations or interpretations such as those which control the instant case. While "interpretive regulations" do not have the effect of law, courts do accord them great deference. *See e. g. General Electric v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

8. Note 6, *supra.*

the enabling legislation." *Thorpe v. Housing Authority City of Durham,* 393 U.S. 268, 280–281, 89 S.Ct. 518, 525, 21 ·L.Ed.2d 474 (1969). *See also American Trucking Assns. v. United States,* 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). 411 U.S. at 369, 93 S.Ct. at 1660–1661. As Professor Davis states: "Regulation Z is in all respects a legislative rule, binding on the court as if it were a statute unless the court has some reason to find it invalid." K. DAVIS, ADMINISTRATIVE LAW TREATISE § 5.03–3 (Supp.1976).

■ There are two other sources which are used by the Federal Reserve Board to effectuate the Federal Act. There are Federal Reserve Board Interpretations of Regulation Z,[9] and there are Federal Reserve Board staff opinions which explain the statute, regulations, and interpretations, usually in a question and answer form.[10] The interpretations, although promulgated by the Federal Reserve Board, are not subject to the procedural review requirements of section 4 of the Administrative Procedure Act,[11] and therefore are not given the status of Board regulations. While not having the effect of law, these interpretations by the Board of their own regulations are entitled, like the "interpretive rules" of other agencies, to "great deference." *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Bone v. Hibernia Bank,* 493 F.2d 135 (9th Cir. 1974); and *Allen M. Campbell Company General Contractors, Inc. v. Lloyd Wood Construction Co.,* 446 F.2d 261 (5th Cir. 1971).

■ Federal Reserve Board staff opinions, although not as authoritative as Board interpretations, are entitled to weight when they concern the construction of a Board regulation or interpretation and are not in conflict with the Truth in Lending Act, a regulation, or an interpretation. *Pollock v. General Finance Corporation,* 552 F.2d 1142 (5th Cir. 1977). In *Pollock* the court said:

The force with which these least authoritative pronouncements are allowed to press on the judicial scales, however, must vary with the circumstances of each case. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1943); *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).[12]

The Court of Civil Appeals in the instant case held that General Electric was liable for violating 12 Code of Federal Regulations § 226.801. The court mistakenly refers to this section as a "regulation." [13] Such is not the case as section 226.801 is a Federal Reserve Board interpretation of Regulation Z. Section 226.801 of 12 Code of Federal Regulations states:

§ 226.801 Location of disclosures when contract, security agreement, and evidence of transaction are combined in a single document.

(a) Some creditors incorporate the terms of a contract, a security agreement and evidence of a transaction in a single document. These documents are designed for processing by mechanical and electronic equipment. If all of the required disclosures under § 226.8 should be placed on the face of such a document, the creditor will be unable to utilize conventional accounting and record keeping equipment because of the size of the re-

---

**9.** 12 Code of Federal Regulations §§ 226.101 et seq.

**10.** See 12 Code of Federal Regulations § 226.-1(d)(4). The Federal Reserve Board staff opinions have been broken down even further into "official" and "unofficial" opinions. Such an analysis is not necessary for the case at hand.

**11.** 5 U.S.C.A. § 553 (1977).

**12.** The United States Supreme Court in *Skidmore, supra,* and then again in *General Electric, supra,* has stated that the weight given in any particular case ". . . will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."

**13.** It has been pointed out how easy it is to be confused by these different sections: ". . . one who looks only at the CFR has no means of knowing that it [a certain interpretative] is not a part of Regulation Z." K. DAVIS, ADMINISTRATIVE LAW TREATISE § 5.03–3 (Supp. 1976).

sulting document. The question arises as to whether required disclosures may be made on the face and the reverse side of such a document.

(b) Where a creditor elects to combine disclosures with the contract, security agreement, and evidence of a transaction in a single document, the disclosures required under § 226.8 shall, in accordance with § 226.6, be made on the face of that document, on its reverse side, or on both sides: *Provided,* That the amount of the finance charge and the annual percentage rate shall appear on the face of the document, and, if the reverse side is used, the printing on both sides of the document shall be equally clear and conspicuous, both sides shall contain the statement "NOTICE: See other side for important information," and the place for the customer's signature shall be provided following the full content of the document. [original emphasis]

■ Part (a) of section 226.801 specifically points out the problem that exists in documents "designed for processing by mechanical and electronic equipment." Part (b) provides that the disclosures required under section 226.8 and section 226.6 may be made on both sides *if* the proper notices are given. This section obviously refers to the problem of making a form small enough for use by mechanical and electronic equipment. It is a narrow exception to the general rule that required disclosures must be made on the same side of the instrument above the signature.

Indeed, the Federal Reserve Board has discussed this interpretation in several of its staff opinions. As stated above, this court is not bound by these opinions, but will in appropriate cases give these opinions deference. In a letter opinion of February 10, 1977, found in 5 CCH Consumer Credit Guide ¶ 31,536, the Board wrote:

It appears that you have misunderstood the intent of § 226.801. As explained in prior Public Information Letters . . . this interpretation was written to alleviate a specific problem, and *it only applies when the contract, security agreement (if any), are combined in a single document designed for processing by mechanical or electronic equipment . . . ."* [14]

This has been the consistent interpretation of the Board since the regulation was promulgated in May 1969. *See also,* 5 CCH Consumer Credit Guide ¶ 31,147 (Letter of July 31, 1974) and 5 CCH Consumer Credit Guide ¶ 31,356 (Letter of March 19, 1976).

The Fifth Circuit when facing a similar situation not only gave these letter opinions great weight, but went further to indicate that without these staff opinions which give section 226.801 a very limited application, section 226.801 might be considered an improper amendment to Regulation Z. *Charles v. Krauss Co.,* 572 F.2d 544 (5th Cir. 1978). It stated:

So long as the section 226.801 exception *is limited to electronic and mechanical equipment as set out in the staff opinion letters,* we think this Interpretation is sufficiently circumscribed that it need not be treated as a substantive change in the one-side rule of Regulation Z.

The court went on to directly hold that 12 Code of Federal Regulations § 226.801 was limited to the narrow circumstance of forms designed for processing by electronic and mechanical devices.

In *Smith v. Chapman,* 436 F.Supp. 58 (W.D.Tex.1977), the defendant tried to use section 226.801 as a defense for the actions he had undertaken. The court there held that:

[t]his Interpretation is ˙ applicable only when all the disclosures cannot be put on one side because the form will not accommodate all the disclosures *because it is designed for processing by mechanical and electronic equipment.*

There is no evidence, nor have the Smails ever contended, that the contract in the instant case was intended for processing by mechanical and electronic equipment. Therefore, General Electric cannot be held liable for its failure to comply with the provisions of section 226.801.

---

14. All emphases herein are added unless otherwise noted.

▇ Although section 226.801 does not apply, the contract must still conform with the requirements of Regulation Z. Section 226.8(a), which is a regulation as opposed to an interpretation, provides in summary that all of the *disclosures required* under section 226.8(b) must be made together on the same side of the page and above the customer's signature. *See also Southwestern Investment Co. v. Mannix*, 557 S.W.2d 755 (Tex. 1977). This contract contains all the required disclosures on the face of it above Mr. Smail's signature. We disagree with the Smails' contention that some required disclosures were contained on the back of the agreement; and therefore hold that this contract does not violate the "one-side" rule of Regulation Z.

▇ Also alleged is a violation of the Federal Truth in Lending Act in that the contract fails to adequately disclose the cost of property insurance as is required in 15 U.S.C.A. § 1605(c). Article 15 U.S.C.A. § 1605(c) states:

(c) Charges or premiums for insurance, written in connection with any consumer credit transaction, against loss of or damage to property or against liability arising out of the ownership or use of property, shall be included in the finance charge unless a clear and specific statement in writing is furnished by the creditor to the person to whom the credit is extended, setting forth the cost of the insurance if obtained from or through the creditor, and stating that the person to whom the credit is extended may choose the person through which the insurance is to be obtained.

The Smails also claim violations of two similar regulations: 12 Code of Federal Regulations § 226.4(h) and 12 Code of Federal Regulations § 226.4(a)(6). The latter concerns the necessity of including the insurance premium as part of the finance charge:

(6) Charges or premiums for insurance, written in connection with any credit transaction, against loss of or damage to property or against liability arising out of the ownership or use of property [shall be included in the finance charge], *unless a clear, conspicuous, and specific statement in writing is furnished by the creditor to the customer setting forth the cost of the insurance if obtained from or through the creditor and stating that the customer may choose the person through which the insurance is to be obtained.*

The former states:

(h) *Computation of insurance premiums.* If any insurance premium is required to be included as a part of the finance charge, the amount to be included shall be the premium for coverage extending over the period of time the creditor will require the customer to maintain such insurance. For this purpose, rates and classifications applicable at the time the credit is extended shall be applied over the full time during which coverage is required, unless the creditor knows or has reason to know that other rates or classifications will be applicable, in which case such other rates or classification shall be used to the extent appropriate.

As seen above, section 1605(c) requires that the premiums charged for the insurance shall be included in the finance charge unless a clear statement of the cost is set out and a person is informed that the insurance may be purchased elsewhere. The regulations simply restate that requirement and set out the necessary disclosures when the premium is included in the finance charge. General Electric clearly states in the contract that the cost of the insurance is $753.00 for a period lasting from the date of the contract (9/21/74) to the expiration date (9/21/77). Furthermore, found in bold type and underscored is the following sentence:

**BUYER HAS THE RIGHT TO OBTAIN SUCH INSURANCE THROUGH AN AGENT OR OTHER PERSON OF BUYER'S CHOICE AS WELL AS THROUGH SELLER.** [Contract's emphasis].

Since both required disclosures are made, General Electric was not required to include the insurance premiums as part of the finance charge.

The Smails further complain that the cost of the insurance for the whole term of the contract is not shown. To require one to project future insurance costs for years in the future would be impractical. Indeed, the Federal Reserve Board has interpreted section 1605 to require only that the cost for the initial term be disclosed when the insurance premiums are not required to be included in the finance charge.[15] This contract has fully complied with the federal statutes and regulations in question by its disclosure of the price and the term of the insurance.

### B. *Texas Consumer Credit Code*

The Smails have appealed the decision of the Court of Civil Appeals that the retail installment contract does not violate the provisions of the Texas Consumer Credit Code.

Their first contention is that the retail installment contract does not satisfy the standard set out in article 5069–7.02(3). That article requires:

[a] retail installment contract shall also contain, in a size equal to at least ten-point bold type, a specific statement that liability insurance coverage for bodily injury and property damage caused to others is not included, if that is the case.

That contract states in bold type:

**LIABILITY INSURANCE FOR BODILY INJURY AND PROPERTY DAMAGE TO OTHERS IS NOT INCLUDED UNLESS SUCH COVERAGE IS PART OF A MOBILE HOMEOWNER'S POLICY PURCHASED HEREUNDER.**

The remainder of the contract clearly shows that no "MOBILE HOMEOWNERS POLICY" was purchased. The box next to it was not checked, and there was no charge entered for such coverage. The contract obviously shows that liability insurance is not included.

The Smails also allege a violation of article 5069–7.02(6)(b), which states:

(6) The retail installment contract shall specifically set out the following items:

(b) The amount of the buyer's down payment, if any, specifying the amounts paid in money and in goods traded in;[16]

In the blank provided for the disclosure of the "cash down payment" the amount of $950.00 was written. All parties agree that the actual down payment was only $300.00, but the amount was inflated by Crawford and the Smails in order to get the necessary financing from General Electric. The $650.00 difference was deducted from the purchase price. It is undisputed that without a down payment of at least $950.00 (which was ten percent of the purchase price), General Electric would have refused to finance the Smails' home. The Smails were in no way deceived and were in fact active participants in deceiving General Electric. The jury found that the Smails knew that the statement was false and that they knew the contract was to be assigned to General Electric; yet Mr. Smail signed the contract and took advantage of the deception. We, therefore, agree with the court below that under the facts of this case, the Smails were *in pari delicto* with the defendants and the award of damages would amount to an unjustifiable windfall.

The Smails further complain that the contractual insurance clause violates article 5069–7.06(3) which requires:

(3) When insurance is required in connection with such a contract or agreement made under this Chapter, the seller or holder shall furnish the borrower a statement which shall clearly and conspicuously state that insurance is requested or required in connection with the contract, and that the buyer shall have the option of furnishing the required insurance either through existing policies of insurance owned or controlled by him or of procuring and furnishing equivalent insurance coverages through any insurance company authorized to transact business in Texas. In addition when any

---

**15.** *12 Code of Federal Regulations* § 226.402.

**16.** This provision is substantially the same as one in the Truth in Lending Act, 15 U.S.C.A. § 1638(a)(2).

requested or required insurance is sold or procured by the seller or holder at a premium or rate of charge not fixed or approved by the State Board of Insurance, the seller or holder shall include such fact in the foregoing statement, and the buyer shall have the option for a period of five days from the date of the contract or agreement of furnishing the required insurance coverage either through existing policies of insurance owned or controlled by him or of procuring and furnishing equivalent insurance coverages through any insurance company authorized to transact business in Texas. Such statement or statements may be made in conjunction with or as part of the retail installment contract required by Article 7.02.

The Smails argue that the contract does not satisfactorily specify the fact that insurance is required for the full term of the contract, and that the contract does not clearly and conspicuously disclose the price.

Article 5069–7.06(3) does not specifically require disclosures of either type of which the Smails now complain. It basically requires disclosures that: 1) insurance is requested or required; 2) the buyer has the option of where to obtain the insurance; and 3) the charge made to the buyer by the seller is not approved or fixed by the State Board of Insurance, if that is the case. The contract in question complies with the first two requirements, and no complaint is made that the amount charged did not comply with the rate approved by the State Board of Insurance.[17]

We find no violations of either the Federal or the Texas Act in the case before us. We, therefore, reverse the judgment of the court below awarding the one-thousand dollar (1,000.00) penalty for a violation of the Federal Act, and further reverse its decision to remand part of the case for a factual determination of legal fees. We affirm the take-nothing judgment of the trial court.

Concurring opinion by JOHNSON, J., in which SPEARS, J., joins.

JOHNSON, Justice, concurring.

This writing concurs in the result obtained in the opinion of the court. In so doing, this writer would emphasize that the issue of substantial compliance has been expressly reserved for future consideration in the opinion.

The opinion of the court of civil appeals has three basic holdings with regard to the federal law: (1) General Electric Credit Corporation violated the federal law; (2) the "availability" of the defense of substantial compliance is not settled; and (3) General Electric Credit Corporation did not substantially comply with the federal law in any event.

The opinion of this court, however, holds that General Electric Credit Corporation did not violate federal law; therefore, the availability of the defense of substantial compliance is not reached. The opinion should not be construed as commenting on the availability of the defense of substantial compliance.

SPEARS, J., joins in this concurring opinion.

---

17. While not argued by the Smails in their briefs to this court, Article 5069–7.06(5) does require that the price and term of the insurance be set out. Although this question is not properly before us, this contract adequately complies with its requirements. The Smails have also alleged that the contract permits the commission of a tort in violation of Article 5069–6.-05, that it contains a disclosure of a security interest in unearned or returned insurance premium on the back in violation of 12 Code of Federal Regulations § 226.8(b)(5), and that it contains an assignment of homestead rights in violation of 12 Code of Federal Regulations § 226.8(b)(5). These points have not been properly preserved, and therefore cannot be considered by this court.