**SOUTHWESTERN BELL TELEPHONE COMPANY, Appellant,**

v.

**The PUBLIC UTILITY COMMISSION OF TEXAS, Appellee.**

No. 3–87–124–CV.

Court of Appeals of Texas, Austin.

Jan. 20, 1988.

Rehearing Denied March 16, 1988.

Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, for appellant.

Jim Mattox, Atty. Gen., Steven Baron, Asst. Atty. Gen., Austin, for Public Utility Com'n of Texas.

Myra A. McDaniel, Robin A. Casey, Bickerstaff, Heath & Smiley, Austin, for Intervenor Amerisystems, Inc.

Before POWERS, BRADY and ABOUSSIE, JJ.

POWERS, Justice.

Southwestern Bell Telephone Company sued for judicial review of a final order issued in a contested case by the Public Utility Commission. Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c, § 69 (Supp.1988); Texas Administrative Procedure and Texas Register Act (APTRA), Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19 (Supp.1987). The Commission appeared and answered in the suit and two other parties, Travis Telecommunications, Inc. and Amerisystems, Inc., were permitted to intervene and defend the Commission's final order. The district court upheld the order and Bell appealed to this Court for the further review authorized by APTRA § 20. We will affirm the judgment of the district court.

### THE CONTROVERSY

The Commission regulates "public utilities" through the agency's administration of the various statutory provisions that constitute PURA. Bell holds a certificate of convenience and necessity, issued by the Commission under PURA § 54, and falls within the agency's regulation with respect to the "telecommunications" services that Bell sells to the public pursuant to a tariff promulgated by the Commission. PURA §§ 18, 27(b), 37, 38.

The City of Austin lies within territory served by Bell under its certificate of convenience and necessity. Adjacent to the University of Texas campus in Austin is

"Dobie Center," a multi-story, privately owned dormitory housing a large number of residential, office, and commercial tenants. Before August 1984, Bell alone provided telephone service to the tenants in each category. In that month and with the consent of the dormitory owner, Travis began to offer telephone service within the building, believing it had a legal right to do so even though it did not hold a certificate of convenience and necessity issued by the Commission. In the resulting competition, it appears that most residential tenants subscribed to the new Travis service while most office and commercial tenants continued to subscribe to Bell's service.

Travis provides telephone service only within the dormitory, utilizing its own lines and equipment situated entirely within the building. Travis subscribes to Bell's "local exchange telephone service," paying for it according to the Commission tariff. Travis receives this service over Bell lines that connect to the Travis switchboard inside the dormitory. Through the Travis switchboard, the company is able to provide its subscribers local and long-distance service (whether furnished by Bell, AT & T, or MCI) over the Bell network, charging Travis subscribers according to rates not regulated by the Commission. Through its own lines and equipment, Travis also furnishes "intercom" service to dormitory residents. In substance, the Travis operations in Dobie Center amount to a "switching system" of the kind at issue in our earlier opinion in *Southwestern Bell Telephone Company v. The Public Utility Commission of Texas*, 735 S.W.2d 663 (Tex.App.1987, no writ).

In September 1985, Bell petitioned the Commission for protection of the company's rights and privileges under its certificate of convenience and necessity, contending the services provided by Travis were unlawful under PURA § 50 because Travis lacked a certificate of convenience and necessity authorizing it to furnish public-utility service. After notice and hearing, the Commission concluded that Travis was not required to obtain a certificate to make its

services lawful. The Commission reasoned that the services provided by Travis did not bring the company within the prohibition contained in PURA § 50, a statute that forbids a "public utility" to render service "in any way" to the public, under a "franchise or permit," without a certificate of convenience and necessity; and, forbids a "retail public utility" to furnish "retail public utility service" in an area where such service is being lawfully furnished under a certificate held by another utility of that character. As discussed below, the Commission's decision resulted from its interpretation and orchestration of various statutory provisions contained in PURA.

In Bell's three points of error, the company contends the Commission's interpretation and orchestration are erroneous; and, when applied to the undisputed facts of the case, they amount to an abuse of agency discretion, an action in excess of the agency's statutory authority, and a violation of certain provisions of PURA that embody fundamental principles of utility regulation. In consequence, Bell claims that the judgment below must be reversed and the controversy remanded to the agency. APTRA § 19(e)(1), (2), (6). Because the central issues are issues of statutory construction, we should first set out the relevant provisions of PURA.

## THE REGULATORY STATUTES

Bell claimed the Commission's protection based on the terms of PURA § 49 and § 50—two provisions in Article VII of PURA, an article comprising § 49 through § 62 under the heading "Certificates of Convenience and Necessity." Sections 49 and 50 provide as follows:

Sec. 49. For the purposes of this article only:

(a) "Retail public utility" means any ... corporation ... now or hereafter operating ... facilities for providing retail utility service.

\* \* \* \* \* \*

Sec. 50. Beginning one year after the effective date of this Act, unless otherwise specified:

(1) No *public utility* may in any way render service directly or indirectly to the public under any franchise or permit without first having obtained from the commission a certificate that the present or future public convenience and necessity require or will require such installation, operation, or extension.

(2) Except as otherwise provided in this article no *retail public utility* may furnish, make available, render, or extend retail public utility service to any area to which retail utility service is being lawfully furnished by *another retail public utility* ... without first having obtained a certificate of public convenience and necessity that includes the area in which the consuming facility is located.

(emphasis supplied). The certificates of convenience and necessity mentioned in PURA § 50 refer to the Commission's licensing function under PURA § 54.

In PURA § 54, the Legislature provided as follows:

(b) Except [for cases not material here], the commission may grant applications and issue certificates only if the commission finds that the certificate is necessary for the service, accommodation, convenience, or safety of the public. The commission may issue the certificate as prayed for, or refuse to issue it, or issue it for the construction of a portion only of the contemplated system or facility or extension thereof, or for the partial exercise only of the right or privilege.

(c) Certificates of convenience and necessity shall be granted on a nondiscriminatory basis after consideration by the commission of the adequacy of existing service, the need for additional service, the effect of the granting of a certificate on the recipient of the certificate and on any public utility of the same kind already serving the proximate area, and on such factors as community values, recreational and park areas, historical and aesthetic values, environmental integrity, and the probable improvement of service or lowering of cost to consumers in such area resulting from the granting of such certificate.

Through its power to control entry into the field by those wishing to provide public-utility services, the Commission works toward achieving certain statutory objectives implicit in PURA § 54(c), where the Legislature has directed the agency to consider several broadly stated factors before deciding whether to issue a certificate of public convenience and necessity: (1) the delicate matter of achieving an optimum balance between monopoly and competition is implicit in the expressions "adequacy of existing service, the need for additional service, the effect of the granting of a certificate on the recipient ... and on any public utility of the same kind already serving the same proximate area;" (2) the interests of consumers are implicit in the phrases "probable improvement of service or lowering of cost ... resulting from the granting of such certificate;" and, (3) a variety of considerations are implicit in the requirement that the Commission consider the effect of the proposed new utility service "on such factors as community values, recreational and park areas, historical and aesthetic values, [and] environmental integrity...."

In our opinion in *Amtel Communications v. The Public Utility Commission of Texas,* 687 S.W.2d 95, 99–103 (Tex.App. 1985, no writ), we discussed the complexity of the Commission's task in orchestrating and adjusting such competing objectives, in a ratemaking context in the "telecommunications" field, noting that the agency's delegated power included a power to make and apply administrative policies so long as they were within constitutional and statutory limits.

The considerations implicit in PURA § 54(c) and in PURA §§ 38, 39 (utility rates set by the Commission must be "just and reasonable" and must yield "a reasonable return" on the utility's invested capital) are basically the "fundamental principles of utility regulation" that Bell invokes in the present case. Bell complains that the Com-

mission's decision is erroneous because: (1) to the extent Travis furnishes telephone service within Dobie Center, Bell's lines and equipment are redundant and the resulting "stranded investment" causes unnecessarily high rates for Bell subscribers or results in their reluctance to use Bell's authorized services; (2) a central purpose and theme throughout PURA is the proper balancing between the benefits accruing to a public utility under the statutory scheme and the burdens imposed on the utility in that scheme; and, (3) the factors the Commission must consider before issuing a certificate, as set out in PURA § 54(c), were intended by the Legislature to apply in the Commission's exercise of all its functions, where those factors logically arise, as they do in the present case where Bell requested the agency's protection of its rights and privileges under its certificate.[1]

Finally, the Commission was required in the present controversy to determine the meaning and scope of PURA § 3(c)(2)(A) and (B); a statutory provision found in a section of the act that defines numerous expressions found throughout PURA. Section 3(c)(2)(A) and (B) provides as follows:

(c) The term "public utility" or "utility," when used in this Act, includes any ... corporation ... now or hereafter owning or operating for compensation in this state equipment or facilities for:

\*   \*   \*   \*   \*   \*

(2)(A) the conveyance, transmission, or reception of communications over a telephone system *as a dominant carrier* as hereinafter defined ("telecommunications utilities" hereinafter); [provided] that specialized communications common

carriers, *resellers of communications,* and other communications carriers who convey, transmit, or receive communications in whole or in part over a telephone system *who are not dominant carriers* are also telecommunications utilities, but the commission's regulatory authority as to them is only as hereinafter defined:

(B) "dominant carrier" ... means (i) a provider of any particular communication service which is provided in whole or in part over a telephone system who as to such service has sufficient market power in a telecommunications market *as determined by the commission* to enable such provider to control prices in a manner adverse to the public interest for such service in such market; and (ii) *any provider of local exchange telephone service* within a certificated [sic] exchange area as to such service. A telecommunications market shall be statewide until January 1, 1985. After this date the commission may, if it determines that the public interest will be serviced, establish separate markets within the state....

(emphasis added).

As discussed below, Bell argued before the Commission that the controversy was governed solely by PURA § 49(a), defining "retail public utility" as any "corporation ... providing retail utility services." Conversely, Bell contended, the definition of "public utility" found in PURA § 3(c)(2)(A) and (B) did *not* apply in the case. The Commission elected to apply PURA § 3(c)(2)(A) and (B) to the case, thereby calling into issue whether Travis was a "dominant carrier" and whether its operations amounted to providing a "local ex-

1. These three generalities and Bell's related argument are stated so broadly as to be practically meaningless in connection with the controlling issues on appeal: what is the proper meaning to be assigned the statutory expression "public utility," "retail public utility," "dominant carrier," and "local exchange telephone service;" and, which of these expressions applies to control the result in Bell's controversy with Travis and the Commission? In addition, Bell urges the three generalities as *absolutes.* This is patently contradicted by other provisions in the PURA scheme. For example, the Commission must administer PURA § 18, adjusting in particular controversies the contrary demands of monopoly and competition, *in addition to* the provisions of PURA that aim at lower costs for consumers, the balancing of benefits and burdens placed on public utilities, and so forth. For these reasons and for those set forth in the text, demonstrating a contrary view of the Commission's duty and discretion in administering and orchestrating the whole of PURA in a workable system of regulation, we overrule Bell's point of error.

change telephone service" within the meaning of that statutory provision—factors that would have been irrelevant under Bell's contention that PURA § 49(a) *alone* was applicable. The threshold issue, discussed below, is the validity of the Commission's choice in applying to the case the provisions found in PURA § 3(c)(2)(A) and (B) while impliedly rejecting any application of PURA § 49(a) in the exclusive sense demanded by Bell.

## HOLDINGS AND DISCUSSION

In the Commission's final order, the agency set forth numerous findings of basic fact based on evidence that is largely undisputed. The parties' only real dispute centers around the conclusions of law stated in the order, which resulted from the Commission's interpretation of the various disputed provisions of PURA.

### The Threshold Issue

Bell contends the controversy is properly governed by the definition of "retail public utility" set forth in PURA § 49(a), where that statutory expression is defined to mean any corporation, "operating, managing, or controlling in Texas facilities for providing retail utility service." This circular definition, expressly made applicable to the licensing provisions of PURA (Article VII or §§ 49–62), does not incorporate the factors of "dominant carrier" and "local exchange service." Bell contends that it is a definition entirely *independent* of and "*broader*" than the term public utility which is defined in section 3 of PURA." (Bell's brief, emphasis added). And because Travis plainly *does* supply retail utility service to some 700 residents of Dobie Center, it is a "retail public utility" forbidden by PURA § 50(2) to render such service except under a certificate of convenience and necessity.

■ Bell's theory depends upon its postulate that the definition of "retail public utility" is independent of and more inclusive than the definition of "public utility" contained in PURA § 3(c)(2)(A), (B). We

believe this postulate to be erroneous. In *City of Coahoma v. The Public Utility Commission*, 626 S.W.2d 488, 491 (Tex. 1982), the Court stated: "[W]e hold that the term 'public utility' used in section 53 *includes* 'retail public utility' as defined in section 49(a)" (emphasis added). If we resort to *ordinary usage* in order to assign meaning to the term "retail public utility", as used in PURA § 49(a) (the *statutory* "definition" being entirely circular), it is plain that the term "public utility" is inherently broader than the term "retail public utility," as the Supreme Court indicated, and not the other way around as Bell contends. Comment, *Certificates of Convenience and Necessity Under the Texas Public Utility Regulatory Act*, 28 Baylor L.Rev. 1115, 1121 (1976).

■ In any event, we should follow the Commission's construction of PURA—the regulatory statute it is required to administer toward effectuating important legislative objectives—provided the agency's construction does not contradict the "plain language" of the statute and provided it is a reasonable construction. *Clarke v. Securities Industry Ass'n.*, 479 U.S. 388, —— ——, 107 S.Ct. 750, 759–60, 93 L.Ed.2d 757, 771–72 (1987). In that regard, we observe that the Supreme Court, in its *Coahoma* opinion, explicitly stated that Article VII of PURA is *ambiguous* in its definitions of "public utility" and "retail public utility." 626 S.W.2d at 490. That being the case, we may not conclude that the Commission's construction of those definitions, and the limiting scope that construction implies, contradicts the "plain language" of the two definitions in PURA § 49. Moreover, it is readily apparent from our discussion in *Southwestern Bell Telephone Company v. The Public Utility Commission of Texas*, 735 S.W.2d at 663, that the Commission is required to apply and harmonize the various statutory definitions in complex technical circumstances and under a statutory framework assigning the agency very difficult tasks indeed. The agency has, not unreasonably, chosen

an evolutionary approach to the problems presented in this class of controversy. *Id.; see also NLRB v. Weingarten, Inc.,* 420 U.S. 251, 267, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975). We conclude the Commission's construction is reasonable in the circumstances.

■ We therefore hold the agency properly ruled that the controversy was determinable under the definitions supplied in PURA § 3(c)(2)(A) and (B).

### Dominant Carrier

While Travis might be classified as a "dominant carrier" because it provided a "local exchange telephone service" (see below), the Commission first concluded that Travis was not a "dominant carrier" because the company's "market power" did not warrant that classification. The effect of this determination is that Travis is not a "public utility" that requires a certificate of convenience and necessity to render lawful its operations in Dobie Center. PURA § 3(c)(2)(A), (B).

Bell argues that Travis *is* the "dominant carrier" *within Dobie Center* since most tenants subscribe to the Travis service; hence, Travis must fall within the literal meaning of the term "dominant carrier" so that a certificate is required of the company even if PURA § 3(c)(2)(A) and (B) govern the case. Consequently, Bell contends the Commission abused its discretion and exceeded its authority in holding to the contrary.

Referring in its order to an earlier Commission proceeding, the Commission stated that "there was no evidence submitted to show that Travis has power to control prices in the statewide long distance or local exchange market." This statement by the Commission implies that the Commission refused to adopt the single-building context demanded by Bell for deciding the "dominant carrier" inquiry. The issue reduces to whether the Commission had under PURA the discretion to make that choice of contexts. We conclude it did.

■ First, the statutory expression "dominant carrier" is not defined in PURA and has in the present context no agreed or accepted meaning as used in that statute. Second, the expression is crucial to any administration of the regulatory scheme and the Commission must interpret the expression, in light of its policies, expertness, experience, and special facilities, if the agency is to administer PURA to accomplish the legislative objectives. Thus, the Legislature intended by necessary implication that the Commission should have discretion to assign meaning to the statutory term it was required to administer in harmony with all the other provisions of PURA. *See, e.g., Davis v. City of Lubbock,* 160 Tex. 38, 326 S.W.2d 699 (1959) (authority to decide what is a "slum" or "blighted area" is legislative prerogative to be exercised only by Legislature or on its behalf by an agency to which it has delegated the power); *Texas Highway Com'n v. El Paso Bldg. & Const. Tr. Coun.,* 149 Tex. 457, 234 S.W.2d 857 (1951) (authority to determine what is "general prevailing rate of per diem wages" is an administrative function.). Even more directly, the Commission was given the power by necessary implication from the very language of PURA § 3(c)(2)(B) wherein the Commission is empowered to "establish separate markets within the state" after January 1, 1985.

■ Bell suggests no reason why the Commission's choice not to adopt the single-building context was irrational, being content rather to argue only that the Commission had no choice but to apply the single-building context. We overrule the point of error.

### Local Exchange Telephone Service

The Commission concluded that Travis' operations and equipment did not constitute a "local exchange telephone service." The effect of this determination is also to exclude Travis from the requirement of a certificate. That is to say, Travis would be a "dominant carrier," irrespective of its

"market power," if the Commission had determined that its operations amounted to the furnishing of a "local exchange service." PURA § 3(c)(2)(B)(ii).

Because PURA omits to define "local exchange telephone service," the Commission has enacted a rule that does so *in part*. The rule provides that a "local exchange service" is:

Telecommunications service provided within service areas in accordance with the local exchange tariffs. It includes the use of exchange facilities *required to establish connections between customer access lines within the exchange and between customer access lines and the long distance facilities serving the exchange*....

(emphasis added). Thus, the rule does one thing only: It defines "local exchange telephone service" solely in terms of the physical or mechanical *function* associated with the service, that is, the *furnishing of a connection* between customers *in* an exchange and those *outside* of an exchange. The rule is *silent* as to the *scope* or *magnitude* of operation necessary to bring the function and the service within the meaning of "public utility" as that term is used in PURA § 3(c). Necessarily, then, this decision was left to be decided on a case-by-case basis whenever the function becomes an issue.

In the present case, the Commission referred to its determinations that Travis was basically a *reseller* of Bell's local exchange service and the long-distance service provided by Bell and others. The agency observed that the connection by which these services were furnished to Travis customers *in a single building* was by means of "switching equipment" *located in the building*. In deciding that this magnitude of operation was not sufficient to come within the meaning of PURA § 3(c), the agency stated in its order:

The use of a piece of switching equipment does not mean that the equipment owner is providing local exchange service; if it did, every PBX operator could be said to be providing local exchange service to the premises served by the PBX.

\* \* \* \* \* \*

Further, the fact that Travis uses its PBX to redistribute and resell the local exchange service provided by [Bell] does not make Travis a provider of local exchange service. Under the current definition of local exchange service, reselling such service is not included....

Based on these statements, the Commission concluded in its order that the services performed by Travis did not fall within the meaning of "local exchange telephone service," used in PURA § 3(c), even though Travis literally performed the physical or mechanical function described in the agency's rule.

In substance, the Commission reasoned that something more than a switchboard operation of the scope provided by Travis within a single building was required to constitute a "local exchange telephone service" that would require the provider to obtain a certificate of convenience and necessity. The choice facing the Commission in arriving at its decision was whether to include this magnitude of operation within the meaning of "public utility." If the operation in question *was* included, then all similar operations in a single building must also come within the term "public utility," with the additional administration and enforcement burdens that ruling would place on the Commission. The Commission chose not to include such operations.

■ While the Commission did not describe the operational characteristics, magnitude, or distinctions that *would* bring the provider of a "local exchange telephone service" within the meaning of PURA § 3(c), we hold the administrative and enforcement burdens just mentioned constitute a rational connection between the choice made by the Commission and the facts of the present case. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d

207 (1962). The agency therefore did not abuse its discretion.

As indicated previously, the Commission acted well within its statutory authority in assigning meaning to the statutory expression "local exchange telephone service," just as it did with respect to the statutory expression "dominant carrier." Similarly, the Commission possessed the requisite authority to determine the magnitude of operation falling within its own interpretive rule defining, by function only, a "local exchange telephone service." *See, e.g., Bullock v. Hewlett–Packard Co.,* 628 S.W.2d 754 (Tex.1982); *General Electric Credit Corp. v. Smail,* 584 S.W.2d 690 (Tex.1979); *B–R Dredging Co. v. Rodriguez,* 564 S.W.2d 693 (Tex.1978).

We should, finally, address a recurring theme in Bell's argument in its briefs and in its oral argument on submission of the appeal. Bell points out that in a previous appeal, *Southwestern Bell Telephone Company v. The Public Utility Commission of Texas,* 735 S.W.2d at 669, we upheld the Commission's decision to determine on a case-by-case basis this class of controversy involving "switching systems." In the present appeal, the Commission was shown to have determined the matter contrary to Bell's position. In the Commission's order, however, it states little in the way of guidance so that *future* controversies of the same class, involving the meaning of "dominant carrier" and "local ex-

change telephone service," might be decided objectively and consistently. Therefore, Bell and others may only compare in a very inexact way the circumstances in future controversies and those involved here.

█ The Commission has undoubted discretion to proceed on a "case-by-case" basis in adjudicating this class of controversy. *See, e.g., Securities and Exchange Commission v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *National Labor Relations Board v. Wyman–Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); *National Labor Relations Board v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). Conceding the Commission's power does not, however, make the agency immune from considerations of fairness in its exercise, and much of Bell's oral argument on submission implied a complaint in this regard.

In PURA § 16(a), the Legislature contemplated that the Commission would use its rulemaking power as well as its power to decide particular cases, even though the latter might have an uncertain effect in future controversies. Proceeding on such a "case-by-case" basis is fully understandable in the context of a relatively new statute, a new rule, a newly competitive marketplace, and complex technical considerations involving competing statutory objectives.[2] *Madden v. Tex. Bd. of Chiropractic Examiners,* 663 S.W.2d 622, 626

---

2. In *SEC v. Chenery Corp.,* 332 U.S. at 202–203, 67 S.Ct. at 1580–1581, the Court mentioned two circumstances when the course of *ad hoc* adjudication, or adjudication on a "case-by-case" basis, may be viewed by the agency as preferable to a rulemaking proceeding: where "the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule;" and, where the problem is so "specialized and varying in nature as to be impossible of capture within the boundaries of a general rule."

At the present time, at least, it appears that both the foregoing considerations apply in the Commission's attempt to draw the line between a small, ordinary switchboard service and a "local exchange telephone service." As indicated in our opinion in *Southwestern Bell Telephone v. The Public Utility Commission of Texas,* 735 S.W.2d at 663, the problem is a new one for the

Commission; it must be decided within a statutory framework that obliges the Commission to pursue and adjust competing public policies committed to the agency's administration by the Legislature; and, it involves technical complexities, as where one or more additional services may be provided over the same lines as voice-communication service—word processing, security-voice mail, and environmental control, for example. The Commission's final order in the present case suggests an additional problem: what *magnitude* of operation will justify the expenditure of agency time and resources in regulating the operations of a provider of a service that is, functionally at least, no different from the service performed by Bell as a "local exchange telephone service."

(Tex.App.1983, writ ref'd n.r.e.); 1 Cooper, *State Administrative Law*, 177–85 (1965).

For many reasons, however, rulemaking under APTRA § 16(a) may become a fairer means of effectuating the same administrative policies as those arrived at and applied, in this class of controversy, on a "case-by-case" basis.[3] Moreover, the Commission's discretion to proceed on a "case-by-case" basis is not absolute—it may have to yield in a particular case to other considerations:

> A different situation, the Court implies, may be presented where the adverse consequences of reliance on the agency's past decisions are substantial, or where new liability is sought to be imposed on individuals for past actions taken in good faith reliance on board pronouncements, or where fines or damages are involved.

Schwartz, *Administrative Law*, § 4.16, at 195 (1984) (summarizing this aspect of the opinion in *Bell Aerospace Co.*); *cf. Madden v. Tex. Board of Chiropractic Examiners*, 663 S.W.2d at 622 (procedural due process required previous notice of issues of fact and law implicit in new agency definition that foreclosed individual from taking agency examination after lengthy study). As in *Bell Aerospace Co.*, however, such considerations are not present in the controversy we now review. To the extent Bell complains about the Commission's proceeding on a "case-by-case" basis, we overrule Bell's contentions.

---

**3.** The procedures applicable to rulemaking and to adjudication, in the agency, are vastly different. *Cf.* APTRA §§ 5–12 and §§ 13–19. The respective advantages and disadvantages of rulemaking and adjudication are mentioned in 1 Cooper, *supra*, 178–180 (1965). There is, however, an inherent preference for the fairness that attends agency policymaking through an exercise of the rulemaking power: "since an administrative agency has 'the ability to make new law prospectively through exercise of its rule-making powers, it has less reason [than a court] to rely upon ad hoc adjudication to formulate new standards of conduct.'" Therefore, "the 'function of filling in the interstices' of regulatory statutes 'should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future.'" *SEC v. Chenery Corp.*, 332 U.S. at 202, 67 S.Ct. at 1580.

Cooper suggests the following general rule to guide administrative agencies in making a choice between proceeding by *ad hoc* adjudication or by rulemaking:

> [W]here an agency faces the alternative of proceeding by rulemaking or by adjudication, the process of rulemaking should be utilized except in cases where there is a danger that its utilization would frustrate the effective accomplishment of the agency's functions. Where such danger exists, ... the advantages to the agency of utilizing the *ad hoc* adjudication technique must be balanced against the possible deleterious public consequences resulting from the retroactive application of a new standard of general application to large numbers of parties who have had no opportunity to be heard as to what the standard should be. Unless the balance clearly preponderates in favor of the *ad hoc* adjudication method, the agency should utilize the rulemaking procedures.

1 Cooper, *supra*, at 181–82.

---

Finding no error as assigned by Bell, we affirm the judgment below.