**Reversed and Rendered and Opinion filed August 13, 2024.**



**In the**

**𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘**

**NO. 14-23-00425-CV**

**BRCC ENTERPRISES LLC, Appellant**

**V.**

**JESSE SKIE, Appellee**

**On Appeal from the 234th District Court
Harris County, Texas
Trial Court Cause No. 2019-19520**

**O P I N I O N**

Plaintiff Jesse Skie sued BRCC Enterprises for breach of an oral contract. The jury found that the two "orally agree[d] that Skie would be paid a guaranteed $100,000.00 bonus, upon the healthy harvest of 1,400 pounds of dry cannabis crop." The jury further found that BRCC did not comply with the agreement and assessed Skie's damages at $100,000.00. The sole issue BRCC presents on appeal is whether the contract is void for illegality. Because federal law criminalizes the "manufacture" of marijuana and no exception applies under the circumstances

presented here, we agree that the contract is unenforceable. We accordingly reverse the trial court's judgment and render judgment that Skie take nothing.

## I. BACKGROUND

Jesse Skie accepted an employment offer made in Houston by his longtime friend Chris Cordes in April 2017. Cordes sought Skie's help starting the first marijuana farm in what was to become "an empire." The two orally agreed that while Skie worked on-site at the farm in Oregon, he would be provided with housing and meals and would be paid $3,000 each month. Cordes guaranteed Skie a $100,000 bonus upon the "healthy harvest of 1,400 pounds of dry cannabis crop." Cordes and his business partner Ben Runyan operated the farm and employed Skie as BRCC Enterprises LLC d/b/a Nature's Gold.

Although the State of Oregon does not outlaw cultivating, harvesting, or possessing marijuana for medical or recreational use, such acts violate the federal Controlled Substance Act (the CSA).[1]

Skie moved to Oregon and obtained state licenses to work on a marijuana farm. Among other things, he fenced the two-acre plot, prepared the land, converted a shipping container to an office, installed a camera system, built an outdoor kitchen and furniture, constructed a system to hold additional plants, installed plumbing to deliver nutrients to the plants, and treated the plants with organic pesticides. When he was not busy with such construction tasks, Skie assisted in the garden, working as many as eighteen hours a day when harvesting the crop. That year, the farm harvested more than 23,000 pounds of marijuana by "wet weight." The "dry weight" of marijuana is a quarter of that, or well over 5,000 pounds.

---

[1] *See* 21 U.S.C. § 801 *et seq.*

When Skie asked for his $100,000 bonus, BRCC told him that it could not pay yet because it had not yet made any sales. Skie suggested that BRCC sign a contract agreeing to continue paying him $3,000 per month and deducting that amount from the $100,000 bonus until BRCC was able to pay the remainder. BRCC refused to sign a contract, and in December 2017, Skie returned to Texas.

Skie sued BRCC and Cordes and asserted several causes of action, but ultimately, the only claim submitted to the jury was Skie's claim against BRCC for breach of contract. The jury was asked whether "BRCC and Skie orally agree[d] that Skie would be paid a guaranteed $100,000.00 bonus, upon the healthy harvest of 1,400 pounds of dry cannabis crop," and if so, "[d]id BRCC fail to comply with the agreement?" The jury answered "yes" to both questions and assessed damages at $100,000.

Throughout the case, BRCC asserted the affirmative defense of illegality. BRCC raised the issue in special exceptions, in a motion for summary judgment, in its motion for directed verdict, and in its motion for judgment notwithstanding the verdict. The trial court denied each and rendered judgment on the verdict.

## II. ISSUE PRESENTED

In its sole appellate issue, BRCC argues that the trial court erred in denying its motion for judgment notwithstanding the verdict because BRCC established the contract's illegality as a matter of law.

We analyze the denial of a motion for judgment notwithstanding the verdict under the legal-sufficiency standard of review. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We review the evidence in the light most favorable to the verdict, crediting the evidence supporting the verdict if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Id.* at 827.

3

Evidence is legally insufficient if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. The ultimate test is whether the evidence at trial would enable reasonable and fair-minded people to reach the answer under review. *Id.* at 827.

## III. IDENTIFYING THE GOVERNING LAW

To eliminate a possible source of confusion, we begin by clarifying that this case requires us to use the related terms "illegal" and "illegality" not only in different senses, but under different bodies of law. In the most obvious usage, an act is "illegal" if it is prohibited by law. But "illegality" is also a common-law affirmative defense to an action for breach of contract.

Courts have reached different results in deciding whether state or federal law governs the determination that illegality renders a contract unenforceable. Where, as here, it is alleged that a contract violates federal law, some courts have determined the effect of that illegality under state law while others have applied federal law. If state contract law applies, there is an additional question of whether Texas or Oregon law applies.

Over the course of this case, BRCC has taken varying positions as to whether enforceability is governed by state or federal law,[2] but in the end, BRCC argued in its motion for judgment notwithstanding the verdict that "Texas law regarding the

---

[2] In its special exceptions, BRCC did not expressly identify which law applied but it cited only state-law cases, as did Skie in its response. In its motion for instructed verdict and in its bench brief, BRCC argued that federal law applies, but post-verdict, BRCC reverted to its original position that state law applies.

illegality defense" supported its position that the contract is unenforceable because it violates federal law.[3] In his response, Skie appears to have agreed that state law applies, but he argued for the application of Oregon law. Nevertheless, Skie abandoned this argument at the hearing on the motion. When BRCC's counsel asked the trial court to state on the record whether it applied Oregon or Texas law, the trial court said, "There was never a choice of law issue," and Skie's counsel responded, "That's correct." The trial then clarified that it applied Texas law.[4]

On appeal, Skie does not contend that federal illegality law applies but instead appears to share BRCC's assumption that the effect of illegality is governed by state law.[5] Moreover, neither party contends that applying federal illegality law rather

---

[3] *See, e.g.*, 21 U.S.C. Schedule I § 812(c)(10) (listing marijuana as a Schedule I controlled substance); *id.* § 841(a)(1) ("Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . .").

[4] At the hearing on BRCC's motion for judgment notwithstanding the verdict. BRCC argued and cited Texas law supporting its position that it had conclusively proved the affirmative defense of illegality. In response, Skie cited an Oregon statute concerning the enforceability of a contract for the manufacture or possession of marijuana prohibited by federal law. At the hearing on the motion, the parties and the trial court had the following exchange:

> [*BRCC'S COUNSEL*]: It would be helpful, and I know that there's been some reference to Oregon law, if Your Honor would kindly state on the record what — if Oregon or Texas law has been used —
>
> *THE COURT:* There was never a choice of law issue.
>
> [*SKIE'S COUNSEL*]: That's correct.
>
> *THE COURT:* It was always in Texas.
>
> [*BRCC's COUNSEL*]: Understood. Thank you, Your Honor.

By agreeing on the record that there was no choice-of-law issue, Skie waived any contention that Oregon law governs the question of whether a contract is enforceable if it violates federal law. *Cf. Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 473 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("Choice of law issues can be waived if not properly invoked.").

[5] For example, Skie argues that "Texas illegality jurisprudence does not support treating the employment contract as unenforceable" (initial capitalization removed) and that the public policies of Texas include "protecting its citizens['] rights to be paid for their labor and also in upholding the sanctity of contracts issued within the state."

than Texas illegality law would affect this appeal's disposition.[6] We accordingly assume, without deciding, that Texas illegality law applies. *See also Kokernot v. Gilstrap*, 143 Tex. 595, 600, 187 S.W.2d 368, 370 (1945) (contract violating federal law held void under Texas illegality law) (citing *Beer v. Landman*, 88 Tex. 450, 31 S.W. 805 (1895)); *cf Centex Corp. v. Dalton*, 840 S.W.2d 952, 954, 956 (Tex. 1992) (discussing "impossibility due to illegality" and holding contract unenforceable under state law because the payment required by the contract would violate a federal prohibition).

## IV. TEXAS LAW ON ILLEGALITY

Texas law favors the parties' "right to contract as they see fit as long as their agreement does not violate the law or public policy." *In re City of Galveston*, 622 S.W.3d 851, 858 (Tex. 2021) (orig. proceeding) (quoting *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004) (orig. proceeding)). On the other hand, "'[a] contract to do a thing which cannot be performed without violation of the law' violates public policy and is void." *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 483 (Tex. 2016) (quoting *In re Kasschau,* 11 S.W.3d 305, 312 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding)). Illegality is an affirmative defense to a breach-of-contract claim. *See* TEX. R. CIV. P. 94. The purpose of the illegality defense is "to discountenance and discourage improper contracts" by refusing to enforce them, without regard to the effect upon the parties to the transaction. *Patrizi v. McAninch*, 153 Tex. 389, 396–97, 269 S.W.2d 343, 348–49 (1954).

An illegal contract is one in which the parties undertake to do an act forbidden by the law of place where it is to be done. *SCI Tex. Funeral Servs., Inc. v. Hijar*, 214

---

[6] *See, e.g.*, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77, 102 S. Ct. 851, 856, 70 L. Ed. 2d 833 (1982) ("There is no statutory code of federal contract law, but our cases leave no doubt that illegal promises will not be enforced in cases controlled by the federal law.").

S.W.3d 148, 156 (Tex. App.—El Paso 2007, pet. denied) (op. on reh'g). Because federal law applies throughout the United States and preempts conflicting state law,[7] an act that is authorized by state law is illegal in the place where it is to be performed if it is prohibited by federal law that preempts the state law.

Because we presume that the contracting parties know the law, a court generally leaves the parties to illegal contracts where it finds them. *Kokernot*, 143 Tex. at 600, 187 S.W.2d at 370; *Kasschau*, 11 S.W.3d at 312. It is for this reason that the illegality defense is said to reflect the maxim, *In pari delicto potior est conditio defendentis*: "In a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, 105 S. Ct. 2622, 86 L. Ed. 2d 215 (1985) (quoting BLACK'S LAW DICTIONARY 711 (5th ed. 1979)) (alterations in original).

As applicable to the issue presented in this appeal, there are two exceptions in which a contract may be enforced despite its illegality.[8]

First, the contract may be enforced "when the parties are not in *pari delicto* and it is the least culpable party that is seeking relief." *Lon Smith & Assocs., Inc. v. Key*, 527 S.W.3d 604, 618 (Tex. App.—Fort Worth 2017, pet. denied). This is the

---

[7] U.S. CONST. art. VI, cl. 2 (the Constitution and federal laws are "the supreme Law of the Land"); *Rogers v. Bagley*, 623 S.W.3d 343, 353 (Tex. 2021) ("When federal law and state law conflict, the inconsistent state law necessarily gives way to the federal law.").

[8] Another exception, not applicable here, "is that where the consideration for an agreement is made up of several parts, some of which are legal while others are illegal, and the legal portions of the consideration can be separated from the illegal portions, the agreement will be upheld as to the legal portions." *Cox Feedlots, Inc. v. Hope*, 498 S.W.2d 436, 438 (Tex. App.—San Antonio 1973, writ ref'd n.r.e.). Part of Skie's contract with BRCC was fully performed by both sides: Skie was paid a monthly stipend as agreed while working for BRCC, and the enforceability of that part of the contract is not at issue. The only part of the contract at issue here is the enforceability of BRCC's obligation to pay Skie a bonus of $100,000 upon the healthy harvest of 1,400 pounds of marijuana. Because BRCC's contractual obligation to pay the bonus was entirely dependent on the marijuana harvest, the two cannot be separated.

case when the illegality "depends on the existence of peculiar facts known to the defendant but unknown to the plaintiff." *Id.* Such a mistake of fact may permit relief, but a mistake of law will not. *See id*.

Second, even if the parties are *in pari delicto*, the contract may be enforced "if public policy demands it." *Lewis v. Davis*, 145 Tex. 468, 477, 199 S.W.2d 146, 151 (1947). In the same opinion, the court also phrased the public-policy exception in a manner suggesting a lower bar to enforcement:

> [I]n reaching a decision as to granting or withholding relief, the question whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other. The solution of the question depends upon the peculiar facts and the equities of the case, and the answer usually given is that which it is thought will better serve public policy.

*Id.*, 145 Tex. at 477, 199 S.W.2d at 151.

## V. ILLEGALITY IN THE PLACE OF PERFORMANCE

The illegality defense applies to a breach-of-contract claim only if the contract requires a party "to undertake to do an act forbidden by the law of the place where it is be done." *Miller v. Long-Bell Lumber Co.*, 222 S.W.2d 244, 246 (Tex. 1949). To determine whether the illegality defense applies here, we begin by identifying the acts required by the contract and determining whether those acts are prohibited in Oregon, where the contract was to be performed.

### A.    Acts Required by the Contract

Skie first suggests that the affirmative defense of illegality does not apply because "the jury found Mr. Skie was hired to perform construction services and was to be paid $100,000 upon *successful* completion of the construction project with

success defined as an attainment of a marijuana crop at a certain level."[9] In other words, Skie contends that that the illegality defense is inapplicable because he did not agree to perform, and did not himself perform, any illegal act, and that the jury agreed.

These representations are directly contradicted by the pleadings, the evidence, and the verdict.

Skie pleaded that he and BRCC entered into an employment agreement in which Skie's job duties included "construct[ing] a cannabis farm" and "ensuring a healthy harvest." He alleged that he "provided valuable services to BRC[C] in the form of labor in building, *growing and harvesting* the cannabis crop" and that he "completed all of his obligations under his Employment Agreement with BRCC by *completing the harvest* in December 2017."[10]

The contract terms that Skie alleged in his petition are the same terms he proved at trial. Skie testified the bonus "was just basically for everything that I did," which included not only building, but also "helping out with the garden," using "backpack blowers" to spray the marijuana plants with nutrients and with organic pesticides, and harvesting marijuana for as many as eighteen hours a day during the two months of harvest season. When directly asked, "did you harvest the 1400 pounds of dry -- dry weight marijuana," Skie answered, "Yeah. I built the garden and helped with the harvest."

Skie's testimony was echoed both by his employer and by his co-workers. Cordes, who hired Skie, testified that Skie's work included cultivating and harvesting marijuana. Supervisor Dustin Harvin testified that Skie worked in the

---

[9] Emphasis in original.

[10] Emphasis added.

garden under his, Harvin's, direction. Co-worker Teague Kremer testified that Skie was with him when "we would come back at night and spray all the plants with pesticide and fertilizer." And co-worker Michael Stephens testified that Skie completed the harvest. There is no controverting evidence. There being no evidence that Skie contracted only to perform construction work, the jury was not asked to make such a finding.

Skie is factually mistaken not only about the work he contracted to perform, but also about the circumstances triggering a bonus. According to the jury's verdict, the bonus was tied solely to harvesting marijuana, without regard to whether construction was complete. The jury was asked, "Did BRCC and Skie orally agree that Skie would be paid a guaranteed $100,000.00 bonus, upon the healthy harvest of 1,400 pounds of dry cannabis crop,"[11] and the jury answered, "Yes." The $100,000 that the jury assessed as damages represented "[t]he difference, if any, between the compensation agreed to by the parties and the compensation BRCC paid to Jesse Skie." Thus, the damages awarded represents the compensation promised to Skie for the "healthy harvest of 1,400 pounds of dry cannabis crop."

## B.    Illegality of Those Acts in Oregon

Skie's contract was to be performed in Oregon, and the Oregon legislature has authorized and regulated the commercial production of marijuana for recreational as well as medical use. BRCC was licensed by the State of Oregon to produce recreational marijuana, and the parties do not dispute that BRCC complied with state statutes and regulations in producing and harvesting its marijuana crop in 2017.

---

[11] Skie testified that "cannabis" is marijuana, and the terms were used interchangeably at trial.

But, when determining whether a contract requires an unlawful act, "[i]t must always be borne in mind that the Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution." *Hauenstein v. Lynham*, 100 U.S. 483, 490, 102 S. Ct. 3014, 25 L. Ed. 628 (1879). Under federal law, marijuana is a Schedule I controlled substance, and the CSA provides that, with certain statutory exceptions inapplicable here, "it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). If the CSA preempts the state's marijuana statutes, then growing and harvesting BRCC's marijuana was unlawful.

By its terms, the CSA does not preempt "any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict" between the State and federal provisions, and "the two cannot consistently stand together." 21 U.S.C. § 903. Such a conflict exists "when compliance with both is impossible or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 482 (Tex. 2010) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941)).

"Impossibility" preemption is inapplicable, because one can comply with both state and federal marijuana law by refraining from possessing, using, manufacturing, or distributing marijuana. Regarding "obstacle" preemption,[12] however, state courts have reached varying conclusions about whether the CSA preempts their own state's marijuana laws.[13]

---

[12] *See Hinton*, 329 S.W.3d at 482.

[13] *See, e.g.*, *People v. Crouse*, 388 P.3d 39, 42 (Colo. 2017) (CSA preempts state law); *Buenos Hill Inc. v. Saratoga Springs Planning Bd*., 206 N.Y.S.3d 902, 909–17 (N.Y. Sup. Ct.

Here, we are concerned only with the question of whether harvesting marijuana is illegal in Oregon, and the Oregon Supreme Court has determined that obstacle preemption applies to Oregon law authorizing marijuana-related activities barred by the CSA. *See Emerald Steel Fabricators, Inc. v. Bureau of Labor & Indus.*, 348 Or. 159, 178, 230 P.3d 518, 529 (2010) ("Affirmatively authorizing a use that federal law prohibits stands as an obstacle to the implementation and execution of the full purposes and objectives of the Controlled Substances Act."). In *Emerald Steel*, the Oregon Supreme Court held that obstacle preemption left a state statute authorizing the use of medical marijuana "without effect," *see id.*, and the court pointed out that the CSA prohibits not only the use of marijuana, but also its "manufacture, distribution, and possession." *Id.*, 348 Or. at 174, 230 P.3d at 527 (citing 21 U.S.C. § 841(a)(1)); *see also State v. Ehrensing*, 255 Or. App. 402, 415–16, 296 P.3d 1279, 1286 (2013) (even where state legislature authorized marijuana possession and made law enforcement's seizure of it improper, state cannot authorize its return because possession of marijuana violates CSA).

Because Oregon law gives preemptive effect to the CSA, and the CSA prohibits the harvesting of marijuana as required by the contract, the contract requires an act "forbidden by the law of place where it is to be done."[14]

## C. Unenforceability in the Absence of an Exception

A frequently used test to determine whether illegality bars a contract's enforcement is "whether the plaintiff requires any aid from the illegal transaction to establish his case." *Lewis*, 145 Tex. at 477, 199 S.W.2d at 151. If the contract could have been performed in a legal manner, it will not be declared void because it may

---

2024) (state law not preempted); *Ter Beek v. City of Wyoming*, 495 Mich. 1, 19, 846 N.W.2d 531, 541 (2014) (state law not preempted).

[14] *See SCI Tex. Funeral Servs.*, 214 S.W.3d at 156.

have been performed in an illegal manner in a particular instance. *Id.*, 145 Tex. at 473, 199 S.W.2d at 149.

The preceding discussion establishes that this test is satisfied. To prevail on his breach-of-contract claim, Skie was required to prove that (1) he and BRCC entered into a valid contract, (2) Skie performed or tendered performance, (3) BRCC breached the contract, and (4) Skie was damaged as a result of the breach. *See Comcast Corp. v. Houston Baseball Partners LLC*, 627 S.W.3d 398, 423 (Tex. App.—Houston [14th Dist.] 2021), *aff'd sub nom. McLane Champions, LLC v. Houston Baseball Partners LLC*, 671 S.W.3d 907 (Tex. 2023). The jury found that the contract required BRCC to pay Skie a guaranteed bonus of $100,000 "upon the healthy harvest of 1,400 pounds of dry cannabis crop," so to establish that BRCC breached the obligation to pay the bonus, Skie had to prove, and did prove, that at least 1,400 pounds of dry cannabis were harvested from the farm and that BRCC did not pay him as agreed. Thus, Skie required "aid from the illegal transaction to establish his case," because the same evidence needed to prove his breach-of-contract claim also proved the contract's illegality.

Given the unlawful nature of the contract, the determinative question in this appeal is whether an exception applies to make the contract enforceable despite its illegality.

## VI. EXCEPTION FOR PARTIES NOT *IN PARI DELICTO*

An illegal contract may be enforceable if the parties are not *in pari delicto* and the party seeking relief is the less culpable of the two. Under Texas law, parties are not *in pari delicto* when (1) the contract violates a statute that applies to only one of

the parties,[15] (2) the statute imposes a penalty on only one of the parties,[16] or (3) the illegality "depends on the existence of peculiar facts known to the defendant but unknown to the plaintiff." *Lon Smith*, 527 S.W.3d at 618.[17] In the latter circumstances, a mistake of fact may permit relief, but a mistake of law will not. *See id.*[18]

No one contends that any such circumstances are present here. Both Skie and BRCC agreed to the endeavor and both participated in the cultivation and actual harvesting of marijuana in violation of the CSA. The presumption that the parties knew this was illegal applies equally to them both, and the illegality did not depend on facts peculiarly within the knowledge of one party and unknown to the other.

Skie argues that he and BRCC were not *in pari delicto* only in that BRCC continued to cultivate and sell marijuana in the years after Skie returned to Texas, but those post-breach activities do not affect the parties' relative culpability in contracting to violate the CSA in 2017 or in actually doing so. In that, Skie and BRCC are equally culpable. *See, e.g.*, *Cooke v. Karlseng*, No. 05-18-00206-CV, 2022 WL 1089911, at *7 (Tex. App.—Dallas Apr. 12, 2022, pet. denied) (mem. op.

---

[15] *See Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 108 (Tex. App.—San Antonio 2011, pet. denied).

[16] *See Am. Nat'l Ins. Co. v. Tabor*, 111 Tex. 155, 161, 230 S.W. 397, 400 (1921).

[17] This can occur, for example, if a license is required to engage in a particular occupation, but the person contracting for those services does not know that the other party is unlicensed. In such situations, one person is less culpable because that person's belief that the transaction was legal was based on a mistake of fact as to whether the other party was licensed. *Cf. Lon Smith*, 527 S.W.3d at 618 (clients engaged defendant's services as a public insurance adjuster without knowing that defendant lacked the required license).

[18] This general rule is subject to some narrow exceptions inapplicable here. *See, e.g.*, *Herrmann v. Lindsey*, 136 S.W.3d 286, 292 (Tex. App.—San Antonio 2004, no pet.) (op. on denial of reh'g) ("[I]f the parties enter into the contract at issue based on a mutual mistake about some legal right a party possesses or does not possess prior to the contract at issue, the party may be entitled to rescission of the contract on equitable grounds.").

on remand) (relevant inquiry is whether the parties were *in pari delicto* with respect to the illegality of the parties' transaction).

## VII. PUBLIC-POLICY EXCEPTION

Even when the parties are *in pari delicto*, enforcement may be available if it better serves public policy. *See Lewis*, 145 Tex. at 477, 199 S.W.2d at 151. Whether a contract accords with or violates public policy is a question of law we review de novo. *See Goldman v. Olmstead*, 414 S.W.3d 346, 356 (Tex. App.—Dallas 2013, pet. denied); *Gen. Agents Ins. Co. of Am., Inc. v. El Naggar*, 340 S.W.3d 552, 558 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). Specifically, we consider the public policies served by the federal statutes regarding marijuana cultivation, because the legislature is considered to be the governmental "policy-making body," and we must "defer to the Legislature's policy choices." *White*, 490 S.W.3d at 483–84; *see also Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 665 (Tex. 2008) ("The Legislature determines public policy through the statutes it passes.").

## A    The Public Policy Underpinning the CSA

The Legislature's primary objectives in enacting the CSA were "to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." *Gonzales v. Raich*, 545 U.S. 1, 12, 125 S. Ct. 2195, 162 L. Ed. 2d 1 (2005). Congress chose to accomplish those objectives by, among other things, outlawing the manufacture of marijuana based on Congress's finding that the "illegal . . . manufacture . . . of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801.

15

This congressional finding strongly supports non-enforcement of the contract. Texas courts are most likely to refuse enforcement where, as here, "the contract involves the doing of an act prohibited by statutes that were enacted for the protection of the public health and welfare." *Lon Smith*, 527 S.W.3d at 617. In such circumstances, "it is the duty of the court to at once decline to give [the contract] any validity." *Ben E. Keith Co. v. Lisle Todd Leasing, Inc.*, 734 S.W.2d 725, 727 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (citing *Peniche v. Aeromexico,* 580 S.W.2d 152, 155 (Tex. App.—Houston [1st Dist.] 1979, no writ)).

Skie, however, argues that the trial court's enforcement of the contract comports with public policy as expressed in particular federal actions or is otherwise supported by case law.

## B. Alleged Ambiguities in Federal Public Policy on Marijuana

Perhaps Skie's strongest argument for enforcing the contract despite its illegality is his suggestion that there is a difference between the federal government's *de jure* and *de facto* public policy regarding marijuana, or that federal public policy on marijuana-related activities is at least ambiguous. But that argument ultimately rests on two overgeneralizations.

First, in identifying federal public policy, this argument treats discretionary acts by members of the executive branch as alterations in the public policy as determined by Congress and expressed through legislation. In particular, Skie cites a since-rescinded memorandum from the Office of the Attorney General to attorneys in the Department of Justice on the exercise of prosecutorial discretion, as well as a more recent presidential pardon. But, "Congress is the final authority as to desirable public policy." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001). Neither we nor members of the executive branch can "substitut[e] our conceptions of public policy for those of the legislative

16

body." *Stewart Dry Goods Co. v. Lewis*, 294 U.S. 550, 562, 55 S. Ct. 525, 79 L. Ed. 1054 (1935); *cf. Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 465, 135 S. Ct. 2401, 192 L. Ed. 2d 463 (2015) ("[W]e promote the rule-of-law values to which courts must attend while leaving matters of public policy to Congress."); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 220–21, 100 S. Ct. 2601, 65 L. Ed. 2d 696 (1980) (in construing federal statutes, "questions of public policy cannot be determinative of the outcome unless specific policy choices fairly can be attributed to Congress itself").

Second, Skie's argument treats federal actions targeting specifically identified marijuana offenses or uses as applicable to all marijuana-related activities; however, for the past decade, Congress has treated "medical marijuana" and "recreational marijuana" differently.[19] This case concerns only the latter, but the seemingly conflicting acts of Congress (or of those authorized to act on its behalf) pertain only to medical marijuana, not to the use of marijuana for recreational purposes.[20]

---

[19] We do not suggest that "medical marijuana" necessarily differs physically or chemically from "recreational marijuana"; rather, we use these terms only to differentiate between these uses.

[20] For example, in enacting the CSA, Congress authorized the Attorney General to add or remove drugs from a controlled-substances schedule, or to transfer a drug or other substance to a different schedule, using formal rulemaking procedures. *See* 21 U.S.C. §§ 811, 812. Congress may also exercise this power by legislating directly. *See, e.g.*, Agriculture Improvement Act of 2018, Pub. L. No. 115–334, Title XII, § 12619(b), 132 Stat. 4490, 5018 (2018) (amending the CSA definition of "marihuana" to remove low-THC "hemp" and amending Schedule I to exclude "tetrahydrocannabinols in hemp"). The Attorney General's authority has been generally delegated to the Administrator of the Drug Enforcement Agency. *See* 28 C.F.R. § 0.100(b). This administrative process has been initiated to move marijuana from Schedule I to Schedule III. A Schedule I drug or substance is one (a) with a high potential for abuse; (b) with "no currently accepted medical use for treatment in the United States"; and (c) for which there "is a lack of accepted safety for use of the drug or other substance under medical supervision." 21 U.S.C. § 812(b)(1). A Schedule III drug or substance (a) has a lower potential for abuse than the drugs or substances in Schedules I and II; (b) has a currently accepted medical use in treatment in the United States; and (c) if abused, may lead to moderate or low physical dependence or high psychological dependence. *Id.* § 812(b)(3). If marijuana is moved to Schedule III, then it could be dispensed as a prescription drug, *see id.* § 829(b), and one could register with the Attorney General to manufacture marijuana for "legitimate medical, scientific, or industrial channels." *Id.* § 823(e).

A closer look at the material Skie cites reveals more clearly why those materials do not render the CSA's prohibition against the commercial manufacture of recreational marijuana ambiguous.

### 1. The 2013 Cole Memorandum

An increasing number of states have legalized marijuana, and according to Skie, state legislatures acted in reliance on the memorandum, "Guidance Regarding Marijuana Enforcement," issued by Deputy Attorney General James M. Cole to all U.S. attorneys on August 29, 2013 ("the 2013 Cole Memorandum").[21] In this memorandum, Cole stated that the U.S. Department of Justice would commit "its limited investigative and prosecutorial resources" to "certain enforcement priorities that are particularly important to the federal government," such as preventing distribution of marijuana to minors, preventing revenue from marijuana sales from reaching gangs and cartels, preventing violence in the cultivation and sale of marijuana, and preventing the cultivation, possession, and use of marijuana on public property.[22] On the other hand, Cole advised that, in states that "legaliz[e] marijuana in some form" and "implement strong and effective regulatory and enforcement systems," "the primary means of addressing marijuana-related activity" would be

---

But the manufacture of a controlled substance for recreational use is, and always has been, a criminal offense under the CSA, even as to Schedule III drugs. *See id.* § 841(a)(1) (prohibiting the knowing or intentional manufacture of a controlled substance except as authorized by the CSA); *id.* § 841(b)(1)(E)(i) (if a person is convicted of the knowing or intentional manufacture "of any controlled substance in schedule III, such person shall be sentenced to a term of imprisonment of not more than 10 years"). Thus, merely rescheduling marijuana would have no effect on the federal law prohibiting the conduct at issue here, that is, commercial cultivation of marijuana for recreational use.

[21] James M. Cole, Deputy Att'y Gen., Guidance Regarding Marijuana Enforcement (Aug. 29, 2013), *available at* https://www.justice.gov/opa/pr/justice-department-announces-update-marijuana-enforcement-policy, then click link to "DAG Memo 8-29-13."

[22] *Id.* at 1–2.

"enforcement of state law by state and local law enforcement and regulatory bodies."[23]

In determining whether enforcement or non-enforcement of Skie's contract is more consistent with public policy, the 2013 Cole Memorandum does not affect our analysis for a number of reasons.

First, in contrast to the policy-making function of the legislative branch, law enforcement is a function of the executive branch. The Attorney General and United States Attorneys have broad discretion in deciding whether to prosecute federal crimes "because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *United States v. Armstrong*, 517 U.S. 456, 464, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996) (quoting U.S. CONST., Art. II, § 3 and citing 28 U.S.C. §§ 516, 547). Certainly executive guidance from the Attorney General's office on the exercise of prosecutorial discretion has changed more frequently than the federal law on which that discretion operates. For example, two years before the 2013 Cole Memorandum, the same official gave quite different guidance on the discretionary use of investigative and prosecutorial resources:

> Persons who are in the business of cultivating, selling or distributing marijuana, and those who knowingly facilitate such activities, are in violation of the Controlled Substances Act, regardless of state law. Consistent with resource constraints and the discretion you may exercise in your district, such persons are subject to federal enforcement action, including potential prosecution. State laws or local ordinances are not a defense to civil or criminal enforcement of federal law with respect to such conduct, including enforcement of the CSA.[24]

---

[23] *Id.* at 3.

[24] James M. Cole, Deputy Att'y Gen., *Guidance Regarding the Ogden Memo in Jurisdictions Seeking to Authorize Marijuana for Medical Use* (June 29, 2011), *available at*

Similarly, the 2013 Cole Memorandum was itself rescinded on January 4, 2018. *See* Jefferson Sessions, Att'y Gen., Marijuana Enforcement (Jan. 4, 2018).[25] But, federal law prohibiting the manufacture, possession, use, and distribution of marijuana was the same when each of these three memoranda were issued,[26] and despite the differing enforcement approaches taken in 2011, 2013, and 2018, all three memoranda acknowledge that the CSA "reflect[s] Congress's determination that marijuana is a dangerous drug and that marijuana activity is a serious crime . . . ."[27]

A second problem with Skie's reliance on the 2013 Cole Memorandum is that it contains an express disclaimer:

> [T]his memorandum is intended solely as a guide to the exercise of investigative and prosecutorial discretion. This memorandum does not alter in any way the Department's authority to enforce federal law, including federal laws relating to marijuana, regardless of state law. Neither the guidance herein nor any state or local law provides a legal defense to a violation of federal law, including any civil or criminal violation of the CSA.[28]

By its terms, the 2013 Cole Memorandum offers guidance solely on prioritizing the Justice Department's finite investigative and prosecutorial resources, but no such resources are expended in this civil action between private parties, regardless of whether the contract is or is not enforced.

---

https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/dag-guidance-2011-for-medical-marijuana-use.pdf.

[25] *Available at* https://www.justice.gov/opa/press-release/file/1022196/download ("[P]revious nationwide guidance specific to marijuana enforcement is unnecessary and is rescinded, effective immediately.").

[26] There were no changes in 21 U.S.C. § 841 between August 2010 and December 2018.

[27] 2018 Sessions Memorandum, at 1; 2013 Cole Memorandum, at 1; 2011 Cole Memorandum, at 1; *see also* David W. Ogden, Deputy Att'y Gen., Investigations and Prosecutions in States Authorizing the Medical Use of Marijuana (Oct. 19, 2009), *available at* https://www.justice.gov/sites/default/files/opa/legacy/2009/10/19/medical-marijuana.pdf (same).

[28] 2013 Cole Memorandum, at 4.

Third, even if the 2013 Cole Memorandum could be said to have temporarily suspended federal prosecution of marijuana-related activities that violate the CSA,[29] such suspension would not affect our analysis of the enforceability of the private contract at issue in this case. Under Texas law, "[a] contract, which by its terms exacts a violation of the law, will not subject the defaulting party to damages. . . . And this would be true whether or not the violation of the statute was penalized." *Raywood Rice Canal & Milling Co. v. Erp*, 105 Tex. 161, 166–67, 146 S.W. 155, 158 (1912). The 2013 Cole Memorandum is directed to the exercise of prosecutorial discretion, but it does not, and could not, affect Congress's public-policy decision to prohibit marijuana-related activity.[30]

## 2. *The Presidential Pardons*

As further support for the position that the contract is enforceable for public-policy reasons, Skie notes that President Biden "pardoned persons convicted of federal offenses involving simple possession of marijuana.[31] We assume Skie is

---

[29] As BRCC points out, the limitations period for violations of the CSA is five years. *See* 18 U.S.C. § 3282. Skie and BRCC finished harvesting the marijuana crop in December 2017 and the 2013 Cole Memorandum was rescinded on January 4, 2018, so even if the 2013 Cole Memorandum suspended prosecution while it was in effect, there still remained four years and eleven months during which Skie and BRCC could have been prosecuted for harvesting recreational marijuana in violation of the CSA.

[30] *Cf. Crandon v. United States*, 494 U.S. 152, 177, 110 S. Ct. 997, 108 L. Ed. 2d 132 (1990) (Scalia, J., concurring in judgment) ("The Justice Department, of course, has a very specific responsibility to determine for itself what [a federal criminal] statute means, in order to decide when to prosecute; but we have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference."); *accord, Gonzales v. Oregon*, 546 U.S. 243, 259, 126 S. Ct. 904, 163 L. Ed. 2d 748 (2006) ("Congress did not delegate to the Attorney General authority to carry out or effect all provisions of the CSA.").

[31] Although neither party referred to the presidential pardons in the trial court, parties may construct new arguments on appeal in support of issues raised below. *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 764 n.4 (Tex. 2014). In support of those arguments, parties may rely on authorities not cited in the trial court. *See Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 896 (Tex. 2018). Because Skie argued in the trial court that federal public policy regarding marijuana no longer supports non-enforcement of the contract, we are authorized to consider

referring to the presidential proclamation in which President Biden granted "a full, complete, and unconditional pardon" to all current United States citizens and lawful permanent residents who, on or before October 6, 2022, had committed or had been convicted of simple possession of marijuana in violation 21 U.S.C. § 844 or of D.C. Code § 48-904.01(d)(1).[32] The president later issued a broader pardon to include the commission or conviction, on or before December 22, 2023, of the offenses of simple possession of marijuana, attempted simple possession of marijuana, or use of marijuana" in violation of 21 U.S.C. §§ 844 and 846, or of certain District of Columbia statutes.[33]

The presidential pardons cannot support Skie's position because a pardon is not an expression of public policy. "It is the private though official, act of the executive magistrate."[34] The United States Supreme Court recently held that, except in cases of impeachment, the president may pardon federal crimes even when doing so is "incompatible with the expressed or implied will of Congress." *Trump v. United States*, 144 S. Ct. 2312 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S. Ct. 863, 96 L. Ed. 1153 (1952) (Jackson, J., concurring)).

Finally, although these pardons applied equally to medical and recreational marijuana, neither extended to the "manufacture" of marijuana required by the contract in this case. That activity falls within a different section of the CSA. *See* 21 U.S.C. § 841.

---

Skie's new public-policy arguments, and we take judicial notice of presidential pardons. *See Mosqueda v. Albright Transfer & Storage Co.*, 320 S.W.2d 867, 876 (Tex. App.—Fort Worth 1958, writ ref'd n.r.e.) (op. on reh'g) (Texas courts take judicial notice of presidential proclamations).

[32] Proclamation No. 10467, 87 Fed. Reg. 61441 (Oct. 12, 2022).

[33] Proclamation No. 10688, 88 Fed. Reg. 90,083 (Dec. 28, 2023).

[34] *Herrera v. Collins*, 506 U.S. 390, 413, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) (quoting *United States v. Wilson*, 32 U.S. (7 Pet.) 150, 8 L. Ed. 640 (1833)).

Thus, like the 2013 Cole Memorandum, the presidential pardons do not affect the public policy expressed in the CSA about the marijuana activity at issue here.

### 3. Defunding Prosecution of Medical-Marijuana Offenses Permissible Under State Law

Skie also points out that Congress has included the Rohrabacher–Farr Amendment (also known as the Rohrabacher–Blumenauer amendment) to its annual appropriations statute every fiscal year since 2015. Under this amendment, none of the U.S. Department of Justice's funds may be used to prevent states "from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana."[35] Because Congress passed both the CSA (criminalizing nearly all cultivation of marijuana) and the appropriations bills (defunding prosecution of medical-marijuana offenses that comply with applicable state law), one could argue that Congressional public policy since 2015 has been ambiguous on the subject of marijuana for medical use, at least in those states that have "decriminalized" medical marijuana. *See United States v. McIntosh*, 833 F.3d 1163, 1178 (9th Cir. 2016) (concluding that the 2016 Consolidated Appropriations Act prohibits the Department of Justice "only from preventing the implementation of those specific rules of state law that authorize the use, distribution, possession, or cultivation of medical marijuana").

---

[35] Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014); *accord*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 531, 136 Stat. 4459, 4561 (2022); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 531, 136 Stat. 49, 150–51; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 531, 134 Stat. 1182, 1282–83 (2020); Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 531, 133 Stat. 2317, 2431 (2019); Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 537, 133 Stat. 13, 138; Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 538, 132 Stat. 348, 444–45; Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 537, 131 Stat. 135, 228; Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 542, 129 Stat. 2242, 2332–33 (2015).

But the same cannot be said about the federal prohibition against manufacturing marijuana for recreational use, which is the only use at issue in this case.[36]

### 4. Conclusion: Any Congressional Ambiguity Applies Only to Medical Marijuana

As the foregoing illustrates, the Legislature's views about the medical use of marijuana have changed considerably since the CSA's original enactment, but its views on recreational marijuana have changed more slowly, if at all. A similar trend is seen among state legislatures: the majority of states have "decriminalized" medical marijuana to some extent, but only a minority have similarly "decriminalized" recreational marijuana.

We see this same distinction in our own state. The Texas Compassionate-Use Act[37] permits some medical use of low-THC cannabis, and the Texas Controlled Substances Act exempts from its list of offenses the delivery or possession of such medical-use marijuana in certain circumstances.[38] But the same cannot be said of the recreational use of marijuana. Even in Oregon, medical marijuana was "decriminalized" years before recreational marijuana, and the two uses still require different licenses, are subject to different regulations, and are taxed differently.

---

[36] Even while Congress has been prohibiting the Justice Department from using federal funds to prosecute medical-marijuana activities that are legal under state law, it has simultaneously been prohibiting the District of Columbia from using any appropriated funds "to enact any law, rule, or regulation to legalize or otherwise reduce penalties associated with the possession, use, or distribution of any schedule I substance under the Controlled Substances Act (21 U.S.C. 801 et seq.) or any tetrahydrocannabinols derivative for recreational purposes." *See, e.g.*, Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 809(b), 128 Stat. at 2394; *accord*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 809(b), 136 Stat. at 4722; etc.

[37] TEX. HEALTH & SAFETY CODE §§ 487.001–.256.

[38] *Id.* § 481.111(e).

The increasing acceptance of medical marijuana may help to account for the lack of consensus among courts about federal public policy regarding that use. Some courts have held that insurers cannot rely on illegality to defeat coverage of medical marijuana in states where such use is permitted. *See, e.g.*, *Green Earth Wellness Ctr., LLC v. Atain Specialty Ins. Co*., 163 F. Supp. 3d 821 (D. Col. 2016) (in case involving medical use permitted under state law, court held that insurer could not rely on illegality under the CSA as a defense to coverage of marijuana crop due to "continued erosion of any clear and consistent federal public policy"); *accord*, *Mann v. Gullickson*, No. 15-cv-03630, 2016 WL 6473215 (N.D. Cal. Nov. 2, 2016) (citing *Green Earth*, court rejected illegality defense, noting both the lack of federal enforcement of medical-marijuana offenses in states such as California that permit such use, and that the record did not show that the businesses at issue "directly grew or sold marijuana"). Other courts, even in states that permit medical marijuana, have reached the opposite result. *See Tracy v. USAA Cas. Ins. Co*., No. CIV. 11-00487 LEK, 2012 WL 928186, at *13 (D. Haw. Mar. 16, 2012) ("[T]his Court cannot enforce the [insurance provision covering plants] because Plaintiff's possession and cultivation of marijuana, even for State-authorized medical use, clearly violates federal law."). Similarly, some courts have held that workers' compensation benefits include coverage for medical marijuana prescribed in accordance with state law. *See, e.g.*, *Hager v. M&K Constr*., 247 A.3d 864 (N.J. 2021); *Fegley v. Firestone Tire & Rubber*, 291 A.3d 940, 951 (Pa. Commw. Ct. 2023). But again, other courts have held that requiring employers or carriers to reimburse workers'-compensation patients for medical marijuana would violate federal law. *See, e.g.*, *Bourgoin v. Twin Rivers Paper Co., LLC*, 187 A.3d 10, 20 (Me. 2018); *Musta v. Mendota Heights Dental Ctr*., 965 N.W.2d 312, 324 (Minn. 2021).

Given the prevalence of the distinction drawn between medical and recreational use of marijuana, as well as the fact that the contradictory positions taken by Congress concern only medical marijuana, we disagree with those authorities that find an existing ambiguity in public policy concerning recreational marijuana. The authorities Skie cites that address illegality and federal public policy as applied to medical marijuana are distinguishable from the facts of the case before us.[39] Here, we are concerned only with the commercial manufacture of recreational marijuana—a subject on which federal public policy, as determined by Congress and expressed in the CSA, remains unchanged.

## C. Remedies That Do Not Violate the CSA

Skie also asserts that some courts have limited the illegality defense to those instances in which granting the remedy that the plaintiff seeks would require a violation of law. According to Skie, the trial court properly enforced the contract because it could do so by ordering payment of a money judgment, and BRCC could pay the judgment without violating the CSA.

This argument is unavailing because the proposition that an illegal contract remains enforceable so long as the remedy for its breach is not illegal is inconsistent with Texas illegality law.

Under Texas law, if the contractual obligation to make a payment cannot be separated from the illegal act, then the two "must fall together." *See Patrizi*, 153

---

[39] The distinguishable medical marijuana cases Skie cites include *Green Earth*, *Mann*, *Hager*, and *Fegley*, as well as *Ginsburg v. ICC Holdings, LLC*, 3:16-CV-2311-D, 2017 WL 5467688 (N.D. Tex. Nov. 13, 2017) (Illinois medical marijuana business allegedly defaulted on promissory notes; notes themselves do not violate the CSA), and *Green Cross Medical, Inc. v. Gally*, 395 P.3d 302 (Ariz. Ct. App. 2017) (commercial lessor attempted to terminate lease of property for use as a medical marijuana dispensary; although lessee failed to obtain the required state license, lessor was not entitled to terminate lease because lessee could sublet the property in a way that would comply with state medical marijuana law).

Tex. at 396, 269 S.W.2d at 348; *accord, Ben E. Keith Co.*, 734 S.W.2d at 727. Because Skie's right to the bonus payment arose only upon the "healthy harvest of 1,400 pounds of dry cannabis crop," the illegal harvest and the resulting payment obligation cannot be separated.[40] Moreover, we are not persuaded by the reasoning of the cases Skie cites in support of his argument that an illegal contract is enforceable so long as relief can be granted that is not itself unlawful.

In *Mann v. Gullickson*, 2016 WL 6473215 (N.D. Cal. Nov. 2, 2016), the plaintiff sued the defendant for failure to make payments under a promissory note. *Id.* at *1. The notes were given in payment for two businesses that provided growing equipment and consulting services to medical-marijuana entrepreneurs, patients, and doctors, but the businesses themselves did not grow or sell marijuana, and payment of the notes did not require the defendant to violate the CSA. *See id.* The trial court denied the defendant's summary-judgment motion on illegality, pointing out that "[the] object of the contract here is not *necessarily* illegal." *See id.* at *8 & n.4 (emphasis in original). This outcome is consistent with Texas law that the illegality defense does not apply to a contract that can be performed without violating the law. The case does not persuade us that a contract that cannot be lawfully performed is nevertheless enforceable if the judgment does not require a *further* violation of the law.

The same is true of another "marijuana consultant" case Skie cites, *Siva Enterprises v. Ott*, No. 2-18-cv-0881-CAS, 2018 WL 6844714 (C.D. Cal. Nov. 5, 2018). Siva was a company providing "cannabis-focused licensing, consulting and branding services." *Id.* at *3. It sued certain former officers and employees who

---

[40] *Cf.* 21 U.S.C. § 853 ("any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result" of such a violation of the CSA is subject to criminal forfeiture, and "[a]ll right, title, and interest in [such property] vests in the United States upon the commission of the act giving rise to forfeiture").

allegedly misappropriated proprietary data to start a competing consulting firm. *See id*. at \*2–3. The defendants moved to dismiss the case, arguing that plaintiffs lacked standing because "the facilitation of the 'trafficking' of recreational marijuana . . . cannot give rise to a legally cognizable injury." *Id*. at \*5. The authoring court rejected that argument because "the dispute in this case does not involve the actual production or sale of cannabis." *Id*. at \*5. In contrast, Skie's contract did call for the production of marijuana.

We also are not persuaded by cases governed by state statutes that expressly or impliedly eliminate the illegality defense to the marijuana-related activities at issue. For example, *Fegley v. Firestone Tire & Rubber*, 291 A.3d 940 (Pa. Commw. Ct. 2023), is a medical-marijuana case by a Pennsylvania court applying Pennsylvania's illegality law to the question of whether requiring a worker's compensation carrier to reimburse an injured worker for medical marijuana would cause the carrier to violate federal law. In holding that reimbursing the patient for medical marijuana would not violate the CSA, the court relied on Pennsylvania's Medical Marijuana Act (MMA), which states that no individual "shall be subject to arrest, prosecution or penalty in any manner, or denied any right or privilege, . . . solely for lawful use of medical marijuana . . . or for any other action taken in accordance with [the MMA]." *Id.* at 946 (citing 35 PA. STAT. AND CONS. STAT. ANN. § 10231.2103). The cited statute was treated as though it impliedly eliminated the common-law illegality defense as applied to the use of medical marijuana in compliance with Pennsylvania's MMA. *See Taylor v. Tolbert*, 644 S.W.3d 637, 649 (Tex. 2022) (statutes may abrogate the common law); *Lon Smith*, 527 S.W.3d at 618 (describing the illegality defense as a common-law rule).[41] Such

---

[41] The Oregon statute in effect in 2017 was even more specific than that of Pennsylvania. *See* Control, Regulation, and Taxation of Marijuana and Industrial Hemp Act, 2015 Or. Laws 4 (OR. REV. STAT. § 475B) ("No contract shall be unenforceable on the basis that manufacturing,

cases are inapplicable, for no Texas statute has similarly abrogated the defense of illegality as applied to the commercial manufacture of recreational marijuana at issue here.

The final case Skie cites undermines rather than supports his argument. In *Sensoria LLC v. Kaweske*, 581 F. Supp. 3d 1243, 1260 (D. Colo. 2022), investors in Clover Top Holdings, Inc., the holding company for various marijuana businesses, sued Clover Top and its owners, managers, subsidiaries, law firm, and certain competing companies affiliated with the individual defendants. The plaintiffs brought direct and derivative claims against the defendants, alleging a host of tort claims, violations of state and federal laws, and breach of contract. A number of defendants moved to dismiss on the ground that, as framed by the trial court, Clover Top "engaged in illegal conduct that hinders the Court's ability to remedy the damages Plaintiffs suffered." *Id.* at 1256.

The trial court largely agreed. It "affirm[ed] that the illegality defense does apply and with dispositive effect." *Id.* at 1256–57. As the court explained, "The involvement of marijuana was neither tangential nor unexpected. Plaintiffs knew what the essential nature of the undertaking would be. They must explain how this federal court can serve the public's interests if it vindicates their ownership of a CSA-infringing enterprise." *Id.* at 1259. The court further explained that it could not "vindicate equity in or award profits from a business that grows, processes, and sells

---

distributing, dispensing, possessing, or using marijuana is prohibited by federal law."), recodified as § 475B.535, effective Jan. 1, 2018, and recodified as § 475C.505, effective Jan. 1, 2022. On appeal, Skie points out that he filed a pre-trial request for the trial court to take judicial notice of the current version of the statute, and that he reminded the trial court of the statute in his oral response to BRCC's motion for directed verdict and in his written response to BRCC's motion for judgment notwithstanding the verdict. Despite these references to the Oregon statute, Skie later agreed with the trial court that there was no choice-of-law issue and did not object to the trial court's application of Texas law. Skie does not contend on appeal that the trial court erred in applying Texas law.

marijuana" or grant relief "that endorses violating the CSA." *Id.* at 1260. The court could "neither require an act that would violate the CSA nor award monetary damages paid from a marijuana asset or income stream." *Id.* The court also could not impose a constructive trust. *Id.* at 1261. The trial court accordingly dismissed the claims for such relief.

Rescission, however, remained an available remedy, because "[m]erely returning the principal money invested a business does not raise the same concerns as awarding profits from its operation. The investor receives no benefit from the marijuana activity. Moreover, by divesting ownership interests and removing the investor from the marijuana business, it furthers the CSA's goals." *Id.* at 1262.[42] This outcome makes sense, because rescission "restore[s] the parties to the status quo ante by unwinding the contractual exchange instead of pressing it forward." *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 825 (Tex. 2012) (quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 37 cmt. a (2011)). But contract rescission, the remedy available in *Sensoria*, is the antithesis of contract enforcement, which is the remedy that Skie sought and obtained here.[43]

---

[42] The court added the caveat that "the Defendants must refund the principal from money or assets that are independent of their marijuana operations" and that "[t]he actual availability of independent assets or financial resources will have to be determined at a later litigation stage." *Sensoria*, 581 F. Supp. 3d at 1262. But whether BRCC has money or assets that are independent of its marijuana operations was not litigated.

[43] A federal trial court in Alaska followed *Sensoria* in *Erickson v. Pfiester*, No. 1:21-CV-00009-JMK, 2023 WL 6297343, at *3 (D. Alaska Sept. 27, 2023). Like many of the other cases Skie cites, *Erickson* was a ruling on a motion to dismiss for failure to state a claim. The plaintiffs "advanced" money to the defendants to purchase a shipping vessel, and to fund construction, materials, equipment, employee wages, and operating costs in connection with the defendants' plan to start a "marijuana grow operation." *See id.* at *1. One of the plaintiffs additionally alleged that he supplied over 3,000 hours of labor for which he was not paid. The *Erickson* court examined the illegality defense under both federal and Alaska law. In applying federal law, the *Erickson* court followed *Sensoria* in holding that the plaintiffs could recover the funds they invested, noting that "divesting ownership interests and removing the investor from the marijuana business" furthers the CSA's goals. *Id.* at *3 (quoting *Sensoria*, 581 F. Supp. 3d at 1262). Regarding the

In sum, none of the foregoing authorities affects our conclusion that illegality renders the contract unenforceable.

## D.      Avoidance of a Windfall

Citing the cases we have already found to be distinguishable,[44] Skie further contends that the trial court properly enforced the contract because non-enforcement would grant BRCC an unwarranted windfall.

Texas illegality law does not afford much weight to this consideration when, as here, the parties are *in pari delicto*. For example, in *Denson v. Dallas County Credit Union*, a car dealership and its owner sued a credit union for breach of contract. 262 S.W.3d 846, 848 (Tex. App.—Dallas 2008, no pet.). The parties allegedly agreed that the dealership parties would find cars for the credit union's customers; the credit union would finance the purchases; and the profits from the sales would be split evenly between the dealership, the dealership's owner, and the

_____

claim for compensation for labor, the court held that if the plaintiff could prove entitlement to compensation, then the illegality defense did not preclude recovery. *See id.* at *4. However, the court stated that the alleged labor "include[ed] construction, licensing paperwork, fuel supply, logo design, general maintenance, etc." *Id.* The court did not indicate that the plaintiff's labor included the manufacture, distribution, dispensation, or possession of marijuana in violation of the CSA. *Cf.* 21 U.S.C. § 841(a). The court reached the same result under Alaska law but found that the CSA "is ambiguous as it applies to the facts of this case." *Id.* at *5. In reaching that conclusion, the *Erickson* court cited the 2013 Cole Memorandum and its rescission, the Rohrabacher–Farr Amendment to the 2015 appropriations act, and President Biden's 2022 pardon of the marijuana offense of simple possession. *Id.* at *5. For the reasons previously discussed, we conclude that such materials do not render the CSA ambiguous as applied to the commercial manufacture of recreational marijuana at issue in this case.

[44] In three of the four cited cases, the authoring court found the applicable federal public policy to be ambiguous. *See Erickson*, 2023 WL 2023 WL 6297343, at *5 (CSA "is ambiguous as it applies to the facts of this case"); *Green Cross Med.*, 395 P.3d at 308 (citing *Mann* as authority that "federal policy on medical marijuana authorized by states was in a state of flux"); *Mann*, 2016 WL 6473215, at *8 ("[G]iven the ever-changing political climate concerning medical marijuana . . . the Court cannot ignore the potential likelihood of a windfall for Gullickson if she is able to dodge the contract at this point."). The fourth case was a suit on promissory notes that did not violate the CSA, require violation of the CSA, or even mention marijuana. *See Ginsburg*, 2017 WL 5467688, at *7.

31

credit union's agent. *See id.* The credit union moved for traditional summary judgment on the affirmative defense of illegality, pointing out that the dealership was licensed to sell cars in other counties, but was not licensed, and did not meet the requirements to become licensed, in the county where these events occurred. *See id.* at 852–53. The trial court agreed. On appeal, the dealership parties argued that "allowing the Credit Union to prevail on the illegality defense allows it to walk away with a windfall." *Id.* at 855. The reviewing court nevertheless upheld the trial court's refusal to enforce the illegal contract *despite* any windfall to the defendant, stating, "[a]lthough this may be true under these facts, to hold otherwise would allow individuals to indirectly profit from a business they are directly prohibited from engaging in unless properly licensed by statute." *Id.*

Stated another way, "[c]ourts are no more likely to aid one attempting to enforce such a contract than they are disposed in favor of the party who uses the illegality to avoid liability." *Plumlee v. Paddock*, 832 S.W.2d 757, 759 (Tex. App.—Fort Worth 1992, writ denied) (citing *Loggins v. Stewart*, 218 S.W.2d 1011, 1015 (Tex. App.—El Paso 1949, writ ref'd)). Thus, equally culpable parties do not have a *justifiable* expectation that the law will enforce a contract that the law prohibits. In that circumstance, the court does not grant the defendant a windfall simply by leaving the parties where it finds them. *See, e.g.*, *Villanueva v. Gonzalez*, 123 S.W.3d 461, 466–67 (Tex. App.—San Antonio 2003, no pet.) (refusing to enforce illegal contract to split fees from writing bail bonds with an unlicensed person; because parties were *in pari delicto*, non-enforcement does not grant defendant a windfall). To the contrary, it has been said that if a defendant is required to pay damages to an equally culpable plaintiff, then it is the plaintiff who obtains a windfall. *See, e.g.*, *Gen. Elec. Credit Corp. v. Smail*, 584 S.W.2d 690, 698 (Tex. 1979) (awarding damages to consumers *in pari delicto* with defendants "would amount to an

unjustifiable windfall"); *accord*, *Owen v. Jim Allee Imports, Inc.*, 380 S.W.3d 276, 287 (Tex. App.—Dallas 2012, no pet.).

## E. Federal Abstention and FLSA Cases

Finally, Skie cites cases dealing with two other areas of law to support his position that the contract is enforceable, but these, too, are distinguishable.

First, Skie states that federal courts now tend to abstain from exercising jurisdiction over cases concerning marijuana businesses, preferring instead to allow states to promote enforcement of their own marijuana legislation.[45] We are unsure what Skie's citation to such cases is intended to convey. Skie chose to sue in a Texas state court, where he pursued his breach-of-contract claim to a final judgment. There is no question of federal abstention, for federal jurisdiction was never invoked, and there is no basis for the Texas trial court, or this Court, to abstain from exercising their properly invoked jurisdiction over this case.

The other category of cases Skie cites are those in which federal courts held that the illegal nature of a marijuana business does not excuse the business from complying with the Fair Labor Standards Act.[46] *See, e.g.*, *Kenney v. Helix TCS, Inc.*, 939 F.3d 1106, 1112 (10th Cir. 2019) (FLSA applies to security guard for recreational-marijuana company); *Greenwood v. Green Leaf Lab LLC*, No. 3:17-CV-00415-PK, 2017 WL 3391671, at *3 (D. Or. July 13, 2017) (FLSA applies to

---

[45] *See, e.g.*, *Next Step Advisors LLC v. True Harvest Holdings Inc.*, 641 F. Supp. 3d 655 (D. Ariz. 2022) (granting plaintiff's motion to remand case to state court in which it was originally filed); *Gopal v. Luther*, No. 2:21-CV-00735-KJM-CKD, 2022 WL 504983, at *1, *7 (E.D. Cal. Feb. 18, 2022) (same, stating, "State courts have a greater interest in the interpretation of state laws that create regulatory channels for cannabis cultivation, licensing, sales, and distribution, especially when those laws conflict with the CSA"); *but see Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916, 923 (9th Cir. 2024) (despite conflict between state and federal marijuana law, the case, filed directly in federal court, "does not meet the requirements for abstention under any abstention doctrine established by the Supreme Court").

[46] 29 U.S.C. §§ 201–219.

courier for a medical-marijuana testing laboratory), report and recommendation adopted, No. 3:17-CV-00415-PK, 2017 WL 3391647 (D. Or. Aug. 7, 2017). The reasoning of those cases is that "just because an employer 'is violating one federal law, does not give it licence to violate another.'" *Greenwood*, 2017 WL 3391671, at *3 (quoting a legal-advice memorandum written for the National Labor Relations Board); *Kenney*, 939 F.3d at 1112 (parenthetically quoting *Greenwood* to support statement that "employers are not excused from complying with federal laws just because their business practices are federally prohibited").[47]

Such reasoning is inapplicable to this case, for no one contends that federal law requires BRCC to pay Skie a $100,000 bonus. That obligation is imposed solely by the terms of the parties' contract, not by federal law, and although illegality may not be a valid defense to an FLSA claim, it is a defense to a contract claim.

## VIII. CONCLUSION

This appeal ultimately turns on two questions: First, does harvesting 1,400 pounds of marijuana in Oregon violate the CSA? The answer is yes. The plain language of the CSA prohibits it, and Oregon courts hold that the CSA preempts its state laws that purport to authorize what the CSA prohibits. Second, does Texas's affirmative defense of illegality render the contract to pay a bonus upon the harvesting of the crop unenforceable? On these facts, the answer, again, is yes.

We emphasize that the facts of this case concern only the commercial manufacture of marijuana for recreational use. Congress determined that this activity has a "substantial and detrimental effect on the health and general welfare of the American people," and prohibited it in the CSA's plain language. Although opinions

---

[47] *See also Lucas v. Jerusalem Cafe, LLC*, 721 F.3d 927, 933 (8th Cir. 2013) (pointing out that Al Capone was convicted for failing to pay taxes on illicit income).

vary as to which marijuana-related activities should continue to be prohibited under federal law, opinions are not public policy. For that, we must defer to the Legislature, and the Legislature's prohibition of the commercial manufacture of recreational marijuana was the same in 2017 as when the CSA was enacted. Particularly in matters of public health, the public interest in discouraging the proscribed conduct outweighs a party's interest in enforcing the illegal contract.

Just as we express no opinion as to whether the result would be the same under different facts, we express no opinion on the result under different law, for example, if the contract had been construed under Oregon law. In this case, the trial court applied Texas law and enforced a contractual obligation to pay a bonus if a healthy marijuana crop of a certain size was harvested. Inasmuch as the obligation arises only upon the commission of conduct that constitutes a federal felony, we agree with BRCC that illegality rendered this contract provision unenforceable as a matter of law.

We sustain the sole issue presented, reverse the trial court's judgment, and render judgment that Skie take nothing.


/s/     Tracy Christopher
Chief Justice

Panel consists of Chief Justice Christopher and Justices Zimmerer and Wilson.

35